Joseph MORRIS on behalf of himself and all other inmates of the Adult Correctional Institutions, Cranston, Rhode Island, Plaintiffs,

v.

Anthony P. TRAVISONO, individually and as Commissioner of the Department of Social Welfare of Rhode Island, and John Sharkey, individually and as Acting Warden of the Adult Correctional Institutions at Cranston, Rhode Island, Defendants.

Civ. A. No. 4192.

United States District Court, D. Rhode Island.

March 11, 1970.

William Bennett Turner, Chief Counsel, New York City, John J. Donahue, Cary Coen, John A. Nelson, and Peter W. Thoms, of Rhode Island Legal Services, Inc., Providence, R. I., for plaintiffs.

Edward Burke, Chief Counsel, and Ira Schreiber of R. I. Dept. of Social Welfare, Providence, R. I., Donald Ryan, Asst. Atty. Gen., State of R. I., Providence, R. I., for defendants.

## MEMORANDUM AND ORDER

PETTINE, District Judge.

This is a civil rights suit pursuant to 42 U.S.C. § 1983, in which several issues are raised relating to the constitutionality and statutory permissibility of certain rules, practices, and conditions of life at the Adult Correctional Institution.

The history of this litigation will first be recited in order to establish the background against which this court is ruling. On Saturday, October 11, 1969 an ex parte temporary restraining order was sought by Rhode Island Legal Services on behalf of their clients, a group of prisoners who had allegedly been arbitrarily and discriminatorily segregated out from the general prison population and placed in a so-called Behavioral Control Unit where many of the more ordinary facets of their daily prison life, such as the opportunity to work, the opportunity to engage in regular prison activities, the opportunity to attend chapel, and the like, were denied them. Additionally, it was alleged that health conditions, in part created by the prisoners, and in part permitted to continue by the prison administration, were so seriously deteriorated in the B.C.U. as to amount to a serious health hazard and a violation of the Eighth Amendment to the United States Constitution. After some lengthy discussions with

counsel for the plaintiffs, counsel for the prison administration and others, the court entered a temporary order requiring the defendants to provide the plaintiffs with minimal maintenance of personal hygiene and to permit plaintiffs outdoor exercise and access to religious services. The court further indicated that a physician should immediately examine the B.C.U. to determine the nature of any health hazard there present.

Commencing Monday, October 13, 1969 the court both heard in-court testimony and engaged in in-chambers negotiations in an attempt to break the impasse that had developed between the plaintiff prisoners and the defendant prison administration. For the entire week of October 13, 1969 the court and counsel labored virtually around the clock both in the adversarial atmosphere of the courtroom, where expert testimony met head on and clashed on the issue of the B.C.U. health hazard, and in the negotiation climate of court chambers where segregation and classification were the real bargaining points.

On Wednesday, October 15, 1969 the testimony of Mr. Anthony P. Travisono, the Director of the Department of Social Welfare, set the stage for two crucial developments. The first was the realization that the underlying issue in the case was that of the correctness, legally and penologically, of the classification and segregation concepts and operations. The second was the agreement of the plaintiff prisoners, predicated upon the court's indications that the underlying procedural issues would be considered, to break the impasse by cleaning up the food and excrement which caused the health hazard in the B.C.U.

On Thursday, October 16, 1969 negotiations in private between the parties continued. On Friday, October 17, 1969 several further developments came to light. First, the plaintiffs sought a continuance in order to prepare their case, believed by them then to have been considerably broadened into the area of due process of law in prison life. Second, the plaintiffs' chief counsel, Mr. John Donahue, indicated more than adequate personal health factors as an additional reason for continuance. The court, faced with the still to be tried and still then being negotiated classification matters, entered a temporary order regarding the classification matters. Prior to the entry of that order, the court stated at Transcript 354:

" * * * I will tell you what I am thinking perhaps should be done: These men be placed in a B classification and remain in that classification with whatever rights and privileges go with it until this case is ultimately determined, that the warden will have the right to change this classification down to C or D, but that would have to be based on their conduct, their conduct from this day forward and not for past conduct * * *."

Following a brief recess, the defendants offered a counter-proposal by which all prisoners then remaining in the B.C.U. would be placed into B classification, immediately heard in reclassification proceedings, and thence reclassified as either remaining in B or returned to C or restored to A. No prisoner was to be returned to D status. All classifications were to be predicated upon conduct from October 17, 1969 forward and past prison history, excluding the events between September 27, 1969 and October 17, 1969, except insofar as to consider favorably the cleanup of October 15, 1969. This proposal then was accepted, was entered on the record on Tuesday, October 21, 1969 and the case was continued to November 7, 1969 with certain suggestions by the court as to future proceedings. On October 30, 1969 a motion for further continuance was filed and on October 31, 1969 a continuance to December 5, 1969 was granted so that expert counsel might be found to try this case.

On December 8, 1969 Mr. Cary Coen of Rhode Island Legal Services and Mr. William Bennett Turner of the NAACP

Legal Defense Fund entered their appearances on the record as counsel for the plaintiffs. On December 12, 1969 plaintiffs filed a motion to amend their complaint which was argued on December 15, 1969 and granted as of that date. On December 16, 1969 an amended complaint was filed alleging a class action on behalf of all the prisoners at the Adult Correctional Institution and a separate sub-class action on behalf of those prisoners in the B.C.U. The complaint was a broad-ranging one addressed principally to the constitutionality of the classification and disciplinary procedures and also to certain qualities of prison life at the Institution. From early in December until early January the parties conferred and negotiated to reach settlement of their differences. From the commencement of negotiations the court indicated its willingness to abide by settlement, subject, however, to its own review of the settlement proposal and to its determination of the nature of the decree to be entered. Early in January the parties submitted a draft of the proposed "Regulations Governing Disciplinary and Classification Procedures at the Adult Correctional Institutions, State of Rhode Island" to the court. See Appendix A. This draft represented the arms-length, good-faith bargaining product of the parties.

The court can state unequivocally to those prisoners who may be in doubt that there was no outside influence whatsoever placed upon your counsel who represented you skillfully throughout these difficult and tough bargaining sessions. The court read the proposed Regulations carefully and conferred with counsel. At one such conference it was brought to the court's attention that certain of the plaintiffs, particularly those confined in the B.C.U., were not satisfied with the proposed Regulations and wanted to go to trial. The court then determined to hear the views of these prisoners, all of whom were at this time confined in the B.C.U.

On January 16, 1970 six prisoners, including the named party plaintiff, stated their generalized objections to the Regulations and to certain facets of life at the prison. The court then ordered that the Regulations be prepared and distributed to the prisoners under an order of notice permissible under Fed.R.Civ.P. 23(d)(2) and perhaps mandatory under Fed.R.Civ.P. 23(e). The procedures for preparation and distribution were carried out. The court has received and read with utmost care the responses of the prisoners.

By stipulation of February 2, 1970 it was agreed that new classification proceedings in accordance with the Regulations would commence for all those prisoners who had originally been placed in the B.C.U. on or about September 27, 1969 and who still remained in B, C, or D status. It was further agreed that the court would receive and review all such classification hearings. The court notes that the Regulations are now in effect at the Adult Correctional Institution.

On its own initiative but with the concurrence of the parties the court, moreover, consulted with certain penologists of national experience who pointed out that in their opinion these Regulations are far more precise and provide for much more extended procedures in disciplining and classifying than the Federal regulations. As a matter of fact, it seemed to them that the Regulations in question go well beyond most State systems. The court notes that one expert felt that the organization of classification and disciplinary boards was too highly structured and precluded necessary flexibility, that the role for the warden should be general administrator rather than clinical director, that the procedures were too formalized, rigid and detailed, and that an undue amount of time would be spent at the expense of goals and programs. However, there was not complete agreement in this regard, for others felt that the institution could live with the Regulations recognizing that they would require a great deal of time and attention. To quote directly as to another portion of the com-

ments received, "The tone of the regulations may be a bit unfortunate because they seem to equate classification and disciplinary procedures to criminal trials. The use of the term 'conviction' of a disciplinary offense along with the term 'evidence' seems to imply a quantum and kind of proof required which is beyond the needs of an administrative determination. It might also place an impossible burden upon the administrator who is not learned in the law or the rules of evidence."

As to the classification, the statement was made that, "The breakdown of classifications seems to be logical and desirable."

The following decision, predicated jurisdictionally upon 28 U.S.C. § 1343, and grounded procedurally upon both the court's broad settlement discretion as an Article III court and its settlement and supervisory discretion under Fed.R. Civ.P. 23, gives due weight to the justifiable criticisms of the plaintiff class, to the very real interests of the defendant prison administration in an ordered prison environment, and to the commentary received from the aforementioned penologists.

The responses of the prisoners in both the minimum-medium security section and the maximum security section were quantitatively limited. Certain of the prisoners indicated that this was due to the difficulty many of the prisoners had understanding the Regulations. Many requested the court to come personally to the prison to explain the Regulations and answer questions. After consideration the court cannot think of any means within its control, other than that which has already been carried out, to convey the meaning of the Regulations and their significance to the prisoners, without seriously jeopardizing the judicial function. In addition, the serious grievances raised by the prisoners were generalized and cumulative. The court was able to grasp the real problems by a careful reading of the letters actually sent. Quantitatively, they may not be a statistically sufficient sample. One hundred thirteen answers were received out of a total sentenced prison population of three hundred sixty. Qualitatively, they more than adequately convey the important messages.*

The court will now elaborate those criticisms which were frequently mentioned and which, if true, must be considered serious. They may be divided functionally into (a) grievances outside the scope of this civil action but nevertheless important, (b) grievances within the scope of this civil action but which the court can explain to the presumed satisfaction of the grievants, and (c) one particular grievance which goes not really to the Regulations as such but rather to the conditions of life at the Adult Correctional Institution and which may, after further study and investigation, require further adjudication.

As to those grievances which were repeatedly mentioned and sometimes eloquently elaborated, but which are not within this civil action, the court will merely set them out without any comment. The prisoners should understand, as should the defendants, that the court is not rejecting or accepting these claims legally but is merely ruling them to be irrelevant to *this* law suit.

It has strenuously been claimed that the prison administration has acted discriminatorily toward black inmates, and that black inmates are wholly without representation sensitive to their particular problems. Certain blacks have claimed deprivations of their First Amendment rights to free exercise of their religions.

It has been seriously contended that the work-release program, by which certain inmates are released for work in the community, is too selective, and that

* (There are in addition a varying number of inmates awaiting trial approximating in number 100–125).

many inmates, qualified for work-release, have been arbitrarily denied it.

It has been seriously contended that the Parole Board denies parole to those who qualify for parole, and that the Board is insensitive to the inmates and derelict in its duties.

It has been seriously contended that both jobs and programs of rehabilitation at the prison are either severely limited or non-existent and that financial resources are allocated unduly to security and not at all to rehabilitation.

It has been seriously contended that certain personnel at the prison consistently act arbitrarily, punitively, or incompetently. It has further been contended that there is no effective professional assistance given to inmates. In particular, it has been asserted that there is no attempt to correct professionally social problems such as drug addiction.

It has been contended that medical care and food are inadequate.

The grievances submitted which the court thinks to be inappropriate to this action at this time concern the absence of standards. In particular it has been contended that standards of substantive wrong for which an inmate can be classified into a lower category are either non-existent or so vague as to be meaningless. In essence, this grievance seeks a code of conduct setting out clear but fair categories of intra-prison anti-social behavior for which punishment can be given. While the court has decided to place this grievance beyond the reach of this case, it is one which should be given serious consideration.

A second class of grievances concerns the subject matter of this action but can be explained by this court. There is first the claim that arbitrary and punitive action is a commonplace at the Adult Correctional Institution. The court merely points out that this is one reason for the existence of these Regulations—they are designed to bind prison officials to the rule of law.

It has been contended that those who perform classification functions do not even know the inmate. These Regulations require that the classification officials be thoroughly acquainted with the files of inmates to be classified.

There has been recurrent serious inmate opposition to the final two pages of the Regulations entitled "Emergency or Temporary Provisions." The court, while it can appreciate that opposition, is mindful of the administrative need of the prison officials. The key to the final two pages, as it may be to the whole, is the way in which they are carried out; it would behoove the administration to construe the "Emergency or Temporary Provisions" as narrowly as their language suggests.

It has been complained that no specified penalties are enumerated for particular offenses, and that punitive segregation often extends for indeterminate periods of time. Part B of The Procedural Outline of Disciplinary Action specifies to an extent sufficient, at least on its face and unless shown to be abused, the penalties which may be imposed on an inmate for a violation. Part A(2) of Classification Procedures establishes outer limits for periods of review of inmates in punitive segregation. It too seems sufficient on its face and acceptable unless shown to be abused.

Finally, it has been most seriously and most frequently asserted that the Regulations will not be followed. This is simply not so; these Regulations establish rules of law which *must* be followed. If they are not, enforcement rights may be sought in this court for at least an eighteen-month period from the date of entry of this decision. This retention of jurisdiction will offer the opportunity to revise and improve these Regulations as their practical application may require or appear desirable.

Before passing on to the final and most difficult grievance, the court notes that in general the inmates in their

responses did particularize grievances but did not specifically reject the Regulations and seemed to recognize that there has to be a beginning somewhere; utopia is not upon us. Additionally, certain of the inmates specifically disavowed any desire for membership in the plaintiff class; they were in an exceedingly small minority. Moreover, insofar as this class action involves relief which will apply to the whole institution, it would serve no fruitful purpose now to excise the few dissenting inmates.

The court now turns to that grievance which goes to certain conditions of life at the Adult Correctional Institution and which may, after further study and investigation by the parties, require adjudication in some other action. It is hoped a solution satisfactory to both the prisoners and the prison administration can be reached. See Holt v. Sarver, 300 F.Supp. 825 (E.D.Ark.1969). The Regulations establish classification C which covers " * * * inmates whose conduct indicates chronic inability to adjust to general prison population or who require maximum protection for themselves or others who constitute a serious threat to the security of the institution." The Regulations establish classification D which covers " * * * inmates who because of their course of conduct while classified within Category C require closer control than provided with C Category." Many inmates have complained that the punitive aspects of segregation are basically unfair, destructive of the human person and not reasonably related to any legitimate prison purpose. There is deep-seated inmate resentment at the conditions of life in categories C and D. Many inmates, while conceding the necessity for segregation of prisoners rightfully determined to be dangerous to the prison community, are nevertheless morally offended by the deprivations imposed in the B.C.U.

Faced with this situation, where there appears to be some satisfaction with the Regulations but where there is substantial dissatisfaction with the conditions of life in the B.C.U., the court has decided upon the following course of procedure.

(1) The Regulations, which are now in force at the Adult Correctional Institution in any event, are to become an interim decree of this court and are to be entered on the record forthwith.

(2) For an eighteen-month period from the date of entry of this decision the court will retain jurisdiction over the previously described interim decree. At that time a final decree will be entered. Such retention will allow the parties to get into a working scheme of enforcement of the Regulations but will also permit enough flexibility for necessary rule changes.

(3) Sitting as a single-judge, in accordance with the stipulation of February 2, 1970, this court will receive and consider the reclassifications of all those prisoners who were retained in the B.C.U. after the reclassification hearings which followed the proceedings in this court from October 11, 1969 to October 17, 1969. In short, the court will hear up to date the status of all those inmates who were originally segregated in the B.C.U. on September 27, 1969.

(4) The court will send a standard-form letter to all prisoners requesting their permission to turn over to counsel for the plaintiffs the letters confidentially sent to the court in response to its order of notice. See Appendix B. Any prisoner may deny such permission and his letter will then be retained by this court and entered into the record, under seal. This procedure is done because the plaintiffs' counsel will need those letters to prepare for possible further legal proceedings with respect to the conditions of life in the B.C.U. The policy implicit in the court's previous grant of confidentiality obviously precludes a revelation of the letters to the prison administration.

(5) Upon receipt of the prisoners' responses to the court's request, all letters permitted by their writers to be turned over to plaintiffs' counsel will be so turned over.

## APPENDIX A

### STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
### DEPARTMENT OF SOCIAL WELFARE
### ADULT CORRECTIONAL INSTITUTIONS
#### HOWARD, RHODE ISLAND   02834
#### February 9, 1970

In accordance with the powers invested in me by Section 13–1–2 of the General Laws of Rhode Island, 1956, I herewith promulgate the attached rules and regulations governing the discipline and classification of the inmates of the Adult Correctional Institutions.

John F. Sharkey
Assistant Director for
Correctional Services

---

## NOTICE

A civil action has been commenced in the United States District Court on behalf of Joseph Morris and all other inmates of the Adult Correctional Institutions, raising legal questions concerning the existing classification and disciplinary procedures at the ACI. As a result of said action, attorneys representing the plaintiff inmates and attorneys representing the defendant administrators of the ACI have drafted and submitted to the Court a proposal for new classification and disciplinary procedures to be put into effect as the rules and regulations of the ACI. In order to properly rule on the proposed procedures, the Court has ordered that each inmate affected by them shall be allowed to write to Judge Pettine by sealed, uncensored and unopened letter, his comments, objections or approval, if any, of such proposed procedures.

Agreement was also reached by counsel for all parties, that within fifteen days from the Court order putting the new classification and disciplinary rules into effect, new classification hearings in accordance with the new rules would be held for those inmates placed in the BCU on or about September 27, 1969 and who remain in B C or D status. It was further agreed that Defendants would report the details of each hearing, including records thereof both to the Court and to counsel for the plaintiffs. Because of the time involved in to the Court, it has been further agreed allowing you to make your views known

that these hearings may be held prior to a decision by the Court.

It has also been agreed that upon final approval of the proposed rules and regulations, copies shall be made available to all inmates and officials and said rules and regulations shall be published in a revised inmate guide as soon as possible.

Enclosed you should find:

(1) a copy of the pertinent Court order.

(2) a copy of the proposed rules and regulations.

(3) an envelope and writing paper.

You may read the rules at your convenience during the next five days and if you have any comments you should write them on the paper provided. You are to place your comments in the envelope, seal it and address the envelope to Judge Raymond J. Pettine.

On Monday, February 9th, following the 9 p. m. count, correctional officers will come to each cell with a locked box and you will have the opportunity to place the envelope in the box. The box will be taken with its contents uncensored and unopened to Judge Pettine the next day. He will open it and review your comments.

While awaiting trial men are not involved in the case, ten copies of the proposed rules and accompanying materials will be available for their use in the library. Ten additional copies will be available at the awaiting trial dormitory in the Medium-Minimum Security Section.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

JOSEPH MORRIS, on behalf of himself and all other inmates of the Adult Correctional Institutions, Cranston, Rhode Island,

Plaintiffs,

-against-

ANTHONY T. TRAVISONO, individually and as Commissioner of the Department of Social Welfare of Rhode Island, and JOHN SHARKEY, individually and as Acting Warden of the Adult Correctional Institutions at Cranston, Rhode Island,

Defendants.

CIVIL ACTION
NO. 4192

### ORDER

Upon the report of counsel for all parties to the Court on January 16, 1970 and upon all other papers or proceedings heretofore filed or had herein, it is hereby ordered that Defendants shall promptly distribute to each inmate incarcerated at the Adult Correctional Institutions, excepting those only awaiting trial, one copy of the proposed classification and disciplinary procedures submitted by counsel to the Court on January 16, 1970, including provisions governing:

(A) Hearings to be given to inmates presently in B, C or D status, who were among those moved to the BCU on or about September 27, 1969, (B) the publishing of all rules in a new "Inmate Guide".

Each copy of the proposed classification and disciplinary procedures distributed in the above manner shall be accompanied by written notice

to each inmate that he may write to the Court by sealed, uncensored and unopened letter his comments, objections, or approval if any, of such proposed procedures within five days after receipt thereof.

Defendants shall promptly provide all materials necessary to carry out this order and shall insure that all responses from the inmates will be received by the Court within twenty-one (21) days from the date of this order.

Defendant Travisono shall file an affidavit with the Court detailing the manner of effecting the provisons of this order.

It is so ordered.

Dated January 21 1970

(S) Raymond J. Pettine
Raymond J. Pettine

United States District Judge

(S) Neale Murphy
Clerk

---

REGULATIONS GOVERNING DISCIPLINARY AND CLASSIFICATION PROCEDURES AT THE ADULT CORRECTIONAL INSTITUTIONS, STATE OF RHODE ISLAND

I. *General Information*

A. Definition

Classification * * * contributes to a smoothly, efficiently-operated correctional program by the pooling of all relevant information concerning the offender, by divising a program for the individual based upon that information, and by keeping that program realistically in line with the individual's requirements. It furnishes an orderly method to the institution administrator by which the varied needs and requirements of each inmate may be followed through from commitment to discharge. Through its diagnostic and coordinating functions, classification not only contributes to the objective of rehabilitation but also to custody, discipline, work assignments, officer and inmate morale, and the effective use of training opportunities. Through the data it develops, it assists in long-range planning and development, both in the correctional system as a whole and in the individual institution.

B. Objectives

The Classification Process

The primary objective of classification as a systematic process is the development and administration of an integrated and realistic program of treatment for the individual, with procedures for changing the program when indicated. This primary objective is attained through five general approaches: (a) The analysis of the individual's problems through the use of every available diagnostic technique, including social investigation, medical, psychological, psychiatric examinations, educational, vocational, religious, and recreational studies. The observations of custodial officers offer data of value. (b) A treatment and training program is evolved in staff conference during or after the inmate's personal appearance before the Board, based upon these analyses and a frank discussion of its purposes with the inmate. (c) The program decided upon must be placed into operation. (d) It may be revised when indicated. Classification, a dynamic process, cannot be effective unless program modifications are made in accordance with the changing needs of the individual inmate. (e) What is done for the inmate in the institution needs to be correlated with his program on parole.

C. Essential Features

Essential Features of Classification

1. The Classification Process. The classification process consists of organized procedures by which the diagnosis, treatment-planning, and the carrying out of the component parts of the general treatment program are coordinated and focused on the individual in prison and on parole. Procedures shall be as indicated in the General Laws of Rhode Island, § 13–3–1.

2. The Reception Program. The reception program includes the instruction or orientation of the newly-received inmate regarding the institutional and parole programs during his stay in reception facility while the initial diagnostic case studies are being made.

3. The Admission Summary. The admission summary consists of the compilation, first, of information from all phases of the diagnostic study during the reception period; and, second, of the listing of recommendations issuing from this diagnosis for treatment of each individual. The admission summary is the cornerstone upon which a cumulative case history is developed, as information about the inmate is added to it systematically during his time in prison.

4. The Records Office. A records office, conveniently located and well organized, is essential for the classification program. The cumulative case histories are the primary sources of information about the inmates' programs and all other aspects of their cases.

5. The Institutional Classification Board. The Institutional Classification Board consists of personnel as indicated in the General Laws of Rhode Island, § 13–3–2. They meet together as a whole or in subgroups to consider and to direct the care and treatment program of each individual inmate.

6. The Initial Classification Meeting. The initial classification meeting occurs shortly after an inmate's assignment to an institution. All diagnostic factors available in the case are studied, and a realistic program of custodial care and constructive treatment is formulated.

7. Reclassification. Reclassification meetings are held at regular intervals, and whenever a major change in an inmate's program appears indicated. Such reviews of an individual's case help insure continuity in the treatment program and expedite necessary program revisions to meet the changing needs of the inmate.

8. Classification Procedures Immediately Prior to Parole or Release. These classification procedures shall be as indicated in the General Laws of Rhode Island.

D. Applicable Statutes, Rhode Island General Laws

13–3–1. Receiving and orientation unit—Study of incoming prisoners.—To establish security standards which will safeguard society and which will provide for the most efficient possible rehabilitation of individual prisoners there shall be established within the division of correctional services a receiving and orientation unit which shall receive all male persons sentenced to the adult correctional institutions for a term of imprisonment of more than one (1) year. Every such person so sentenced shall be segregated for a period not to exceed thirty (30) days during which period such person shall be studied and evaluated to determine whether such person shall be a maximum, medium or minimum security risk, and to develop a program of rehabilitation, education and medical and other care as shall be deemed necessary and appropriate to prepare such person to become a useful member of society. During such period medical, psychometric and psychological examinations shall be made of such person and the results thereof, together with the

nature of the offense for which such person has been committed, the previous criminal history, if any, the recommendations of the department of the attorney-general and of the sentencing court and the social history of such person shall be studied and evaluated in determining the degree of custodial care of such person, the rehabilitation program for such person, such medical or other care as may be necessary and such spiritual and religious guidance as shall be indicated by the preference of such person.

13–3–2. Classification board.—For the purpose of such study, there shall be a classification board which shall consist of the warden who shall be chairman, the supervisor of classification, the supervisor of vocational training and education, the deputy warden in charge of custody, and the prison physician. Minutes shall be kept of all meetings and actions and recommendations of the board.

13–3–3. Determination of classification and rehabilitation programs of prisoners.—It shall be the duty of said classification board to review all studies made of each prisoner during the period of his reception and from time to time thereafter as shall be necessary to further the purposes of this chapter; and to recommend to the assistant director the security classification and rehabilitation program for such person. Said assistant director shall review said recommendation and if he shall approve the same he shall cause said recommendation to be put into effect. In the event he shall disapprove the same he shall request said board to make further study and review. In the event thereafter the assistant director shall disapprove such further recommendation the matter shall be resolved by the director of social welfare whose decision shall be final.

13–3–4. Classification unit.—Within said division of correctional services there shall be a classification unit which shall collect and record all the data concerning each person sentenced to the adult correctional institutions. Said unit shall periodically review the file of each male person and shall report to the board its findings and recommendations for such persons as shall have been sentenced to imprisonment for more than one (1) year for such action as the board may deem necessary and appropriate. The classification unit shall furnish the parole board for its consideration in every case the file of each person under consideration for parole.

13–8–22. Manner of obtaining information by board.—The parole board in the discharge of its duties under this chapter shall not be required to receive or consider any petition, and it may secure the information upon which it exercises its authority, or upon which it makes its findings in any case, in such manner and by such means as it may consider most fitting to carry out the purpose of this chapter; provided, however, it shall be the duty of the clerks of the several courts of the state, the sheriffs and their deputies, the police officers of the several cities and towns of the state, the probation officers, the officers of the adult correctional institutions, and every person having charge of any other place where prisoners are confined or detained, to furnish to the parole board and to any member thereof, whenever requested by the board or by any member thereof, any and all information they may have relating to the character and history of any prisoner whose sentence is placed under the control of the board by this chapter.

13–8–23. Agencies required to give reports to parole board.—Information concerning applicants for parole shall be provided by (a) the warden of the adult correctional institutions who shall submit a list of all prisoners under his control who will be eligible for parole in a given month not later than the tenth day of the second month preceding. Such list shall identify the prisoner by name, offense, date of commitment; (b) the warden of the adult correctional institutions who shall secure reports from prison officials who have had direct contact with the prisoner including the deputy warden, the chaplain, the work

detail officer, the prison physician and the classification officer. He shall transmit such reports, together with all pertinent classification information, such as social history, etc., and any actions or recommendations made by a classification board or committee in the institution, to the office of the parole board not later than the twentieth day of the month next preceding the month in which the individual is eligible to appear before the board; (c) the attorney-general's department who shall supply to the office of the parole board a report of any recommendation which it may care to make, and shall consult the trial judge in the case to determine if he may wish to make any comment or recommendation; (d) the state psychiatrist who shall examine the prisoner upon notice from the office of the parole board and shall submit his findings and recommendations to the office of the parole board not later than the twentieth day of the month next preceding the month in which the prisoner is eligible to apear before the board; (e) the state division of psychological services who shall upon notice from the office of the parole board examine the prisoner and report their findings and recommendations to the office of the parole board not later than the twentieth day of the month next preceding the month in which the prisoner is eligible to appear before the board; (f) the state division of correctional services which shall submit a transcript of the previous criminal record of the prisoner including the date of offenses, nature of offenses, and the disposition of each; a copy of the presentence investigation; a full summary of the contact of this division with the prisoner during any prior period under supervision, either probation or parole or both; and any recommendations concerning the current application for parole.

II. *Classification Categories Receiving Status*

   A. Category of all inmates remanded to institution by court after disposition of charge. Receiving status is not to exceed thirty (30) days during which period all procedures outlined in § 13-3-1 of the General Laws of Rhode Island will be observed.

   B. *Category "A"*

   General prison population. Normal category of referral from receiving unit and normal category of inmate during term at Adult Correctional Institutions.

Inmate may be removed from category for the following reasons:

1. Temporary removal for stated period by Disciplinary Board after conviction of disciplinary offense.
2. Reclassification by Classification Board shall be predicated on conduct of inmate which indicates inability to adjust in general prison population for the protection of inmates or others and for the security of the institution.

All inmates within category shall be eligible for all work and educational rehabilitative and recreational programs of the institution. They shall be afforded full visiting privileges in regular institution visiting area together with regular mail privileges and normal category living location.

   C. *Category "B"*

Category of inmates who because of their pattern or conduct require close restrictive movement and closer supervision than Category "A" population on a temporary basis. Work eligibility is suspended in this category; the inmate shall have use of educational materials recommended by education department.

The inmates in this category shall be subject to the following controls:

   "B"

1. Living location to be determined by administration.
2. Unemployed.
3. Meals in cells—subject to administrative decision.

4. No televisions. Radios are permitted.

5. No institutional activities.

6. Normal visiting and mail privileges. No visits unless clean shaven and proper haircut.

7. May attend religious services.

8. Limited yard privileges.

9. Routine health services—normal toilet articles allowed.

10. Regular store orders.

11. Usual clothing regulations.

12. Requests to staff via "pink slip."

13. Reading material—subject to administrative control.

14. Weekly change of linen and laundry service.

### D. Category "C"

Category of inmates whose conduct indicates chronic inability to adjust to general prison population or who require maximum protection for themselves or others or who constitute a serious threat to the security of the institution. The inmates shall have use of educational materials and services recommended by the education department and approved by the Deputy Warden. Hobby activity shall be allowed subject to the control of the Deputy Warden. Inmates in this category shall be subject to the following controls:

"C"

1. Separate living location—to be determined by the administration.

2. Visiting to be held in an area other than the regular visiting room to be approved by a member of the administrative staff with the position of Deputy or above. Inmates to be cleanly shaven and with proper haircuts before being allowed out for visits.

3. All regular store orders except glass.

4. Normal toilet articles.

5. Meals—in cell.

6. Work—routine housekeeping duties within the unit only.

7. Spiritual needs—chaplains to visit regularly or on request.

8. Request to see staff via "pink slip."

9. Health

a) Showers—minimum of two a week in the unit.

b) Physician—submit to officer at breakfast time.

c) Dentist—submit request to officer at breakfast time.

d) Exercise—one hour a day indoors and outdoors alternate dates Monday through Friday. Outdoor exercise will not be given in inclement weather. Weekends and holidays excluded.

e) Medical—emergencies to be attended to immediately.

10. Travel—all inmates leaving and entering the unit shall be searched and shall be escorted to and from their destinations.

11. A reasonable amount of reading material will be allowed. Type of material subject to institutional control.

12. No televisions or phonographs.

13. Radios—with earphones only.

14. Weekly change of linen. Weekly laundry privileges.

15. Mail—usual mail privileges.

16. Clothing—regulation shirt and trousers.

17. No institutional activities.

### E. Category "D"

Category for inmates who because of their course of conduct while classified within Category "C" require closer control than provided with "C" category. In this category the inmates shall have use of educational materials and services recommended by the education department and approved by the Deputy Warden. Hobby activity shall be allowed subject to the control of the Deputy

Warden. Inmates in this category shall be subject to the following controls:

"D"

1. Separate living location to be determined by the administration.
2. Unemployed, except housekeeping details in the unit.
3. Meals in.
4. Spiritual needs—chaplains to visit regularly and upon request.
5. Health—same as "C".
   Exercise—same as "C".
6. Visits—same as "C".
7. Mail—same as "C".
8. Request to see staff—"pink slip."
9. Normal toilet articles except razors.
10. Store orders—toilet articles and tobacco products only.
11. Reading material—current newspaper and not more than six approved publications of any other kind.
12. No institutional activities.
13. No televisions—no radios.
14. Travel—same as "C".
15. Weekly change of linen. Weekly change of laundry.

Inmates in Categories "C" and "D" will reside in the Behavioral Correctional Unit. They shall earn all privileges that can be earned by the general population that are consistent with Behavioral Correctional Unit custody.

### III. *Classification Procedures*

#### A. The Classification Board

1. The Classification Board shall consist of: the warden who shall be chairman, the supervisor of classification, the supervisor of vocational training and education, the deputy warden in charge of custody, and the prison physician. They will meet together as a whole or in subgroups. It shall be the duty of the chairman of the Board to preside at the classification meeting. He shall determine the order of proceeding in each hearing and shall be responsible for determining the relevancy of information presented to the Board. No subgroup shall consist of less than three persons.

2. The Classification Board shall review the status of every inmate in "B" and "C" classifications at least once every 90 days. An inmate placed in "C" classification shall be entitled to review upon his request in writing giving the reason for such request, after 30 days in such classification; and thereafter he shall be entitled to review if either (a) his request is supported by a statement from any institution officer, chaplain, teacher, classification counselor, physician, or employee, or (b) his request includes new information or circumstances not previously called to the attention of the Classification Board. Inmates in "D" classification shall be entitled to review every 30 days.

#### B. Notice

An inmate shall receive timely written notice of the subject and purpose of a classification meeting at which he is to appear. In cases where downgrading of classification grade is to be considered, said notice shall also inform the inmate of his right to be assisted by a classification counselor at the classification meeting. If an inmate requests assistance of a classification counselor, such assistance will be rendered a reasonable time in advance of the hearing.

#### C. The Classification Meeting

1. No decision of the Classification Board considering a possible change of status shall be made without consulting the inmate's central file.

2. The chairman of the Board shall explain the purpose of the meeting and the particular aspects of the inmate's record which may result in a classification change.

3. No misconduct shall be considered by the Classification Board unless the Disciplinary Board has made a finding unfavorable to the inmate.

4. The findings of the Disciplinary Board as to a particular infraction shall be conclusive and not subject to review at the classification hearing.

5. The inmate's file shall not be available to the inmate but may be reviewed by the classification counselor representing the inmate.

6. The inmate shall present pertinent information in relation to the classification procedure.

7. The Board shall discuss with the inmate any contemplation of classification change and the reasons therefor.

8. Upon completion of the discussion, the Board shall take the matter under advisement.

9. After decision is reached the inmate shall be called before the Board to hear the decision and to be advised of its rationale and meaning.

10. A decision of the Classification Board must be based upon substantial evidence and reflect consideration of an inmate's entire record.

11. A record of the classification meeting shall include:

a) A summary of the proceedings and matters considered.

b) The classification decision manifesting a consideration of an inmate's total record and based upon substantial evidence therein.

12. All recommendations of the Classification Board shall be subject to the review of the assistant director pursuant to the provisions of § 13–3–3 of the General Laws of Rhode Island.

IV. *Records*

The central file of each inmate committed to the Adult Correctional Institutions for more than one year must include the following:

A) A copy of a cumulative case summary.

B) Probation officer's report and other diagnostic summaries from other agencies.

C) Up-to-date progress reports in the areas of work assignments, vocational training, education, psychiatry, and medical treatment.

D) Records of Disciplinary Board determinations.

E) Any correspondence relating to the inmate.

F) Identification material, including a recent picture.

G) A record of all classification transactions.

Procedural Outline of
Disciplinary Action

Five Mandatory Steps

1. Written charge by reporting officer or employee.

2. Investigation and review by superior officer.

3. Hearing before Disciplinary Board.

4. Administrative review.

5. Record.

Part A. Rules and Regulations

I. Charge by Reporting Officer or Employee

A. An officer or employee observing minor violations should handle such incidents tactfully and firmly by warning and counseling.

B. When an employee or officer considers a written charge necessary for proper discipline and control, he must show in writing on an inmate violation report form: inmate's name, housing, work assignment, if applicable, time, date, place and charge; give known details concerning the alleged violation, and sign the report.

C. The inmate is to be released or sent to his housing unit pending further action by a superior officer (rank of Lieutenant or above) unless the alleged violation could constitute a threat to institution order or the physical safety of inmates or personnel.

D. An officer may take immediate custody of the inmate being charged if such action is deemed by the officer to be necessary in order to avoid grave assault or serious disorder.

E. When a threat to order or safety is, in an officer's opinion, present as a result of the alleged violation, a superior officer shall determine whether the inmate should be released or held pending further investigation.

## II. Investigation by Superior Officer

A. The reporting officer or employee must submit a written report to a superior officer as soon as possible after the alleged violation occurs.

B. The superior officer shall orally inform the inmate of the charge against him.

C. The superior officer shall conduct a preliminary investigation of the matter without unnecessary delay. The investigation will include interviews with the reporting employee, the inmate charged, and any other employee or inmates indicated.

D. The superior officer shall make written summary of his investigation including the results of his interviews and a notation of notice to the inmate. He shall sign and submit the full report to the Deputy Warden of the facility in which the infraction occurs.

E. The Deputy Warden shall transmit notice of the hearing to the senior classification counselor who shall in turn assign responsibility for the notice and subsequent procedures to a classification counselor. Said notice shall be timely and shall include the time and place of the hearing, the charge, including the time, place, and other persons involved, if any.

F. The assigned classification officer will provide the inmate with a copy of the notice he has received concerning the hearing. Notice of the hearing must be transmitted to the inmate a sufficient period of time prior to the hearing to give the inmate an opportunity to prepare his defense, if any.

G. The inmate being charged shall have the right to be assisted by a classification officer at the disciplinary hearing. The inmate shall be informed of this right as part of the notice provided of the hearing itself.

H. Only a superior officer shall have authority to order an inmate locked up pending a Disciplinary Board hearing. If this is done, it must not be in accordance with punitive segregation regulations, and the inmate must be furnished a bed and regular diet, which will be subject to change only if abused.

I. Only a duly-authorized Disciplinary Board has power to issue punishment to inmates, including those in the Behavioral Correctional Unit.

## III. The Hearing Before the Disciplinary Board

A. The Disciplinary Board shall consist of three members. The Deputy Warden of the facility in which the alleged infraction occurred shall be the chairman. The two remaining members shall be selected from the custody and treatment departments.

B. Any officer or employee who initiates a violation report or who investigates and reviews the initiating officer's report is not eligible to sit on the Disciplinary Board to hear that case.

C. The hearing shall be conducted in the following manner:

1. The circumstances of the charge will be read and fully explained by the chairman of the Board.

2. The inmate shall admit or deny the charges. ·

3. The Board members may interrogate the inmate and others as necessary.

4. If the inmate thinks the charge against him is untrue (in whole or in part), he may present information available to him and others.

5. If the inmate has requested the assistance of a classification counselor, the classification counselor shall assist him in the presentation of the case.

6. Upon completion of the hearing, the Disciplinary Board shall take the matter under advisement.

7. After decision is reached by the Board, the inmate shall be called before the Board to hear the decision and to be advised of its rationale and consequences.

8. A board decision must be based upon substantial evidence.

9. The inmate will be informed that the Board decision will be formally reviewed by the Warden.

10. It is to be made clear to the inmate that he may request assistance from his classification counselor in framing what he believes is wrong with the decision. The inmate shall be allowed to have his objection, if any, incorporated in the case record submitted for review.

IV. Review

A. Within three days of the Disciplinary Board's decision (Sundays and holidays excluded), the record of any proceedings shall be forwarded to the Warden who shall review the record of any proceeding which shall result in an unfavorable decision for the inmate.

B. If the Warden is in agreement with the Disciplinary Board decision, the decision is approved and ordered.

C. If the Warden does not agree with the Disciplinary Board decision, he may order further proceedings or he may reduce or suspend any result of a Disciplinary Board hearing unfavorable to the inmate.

D. The inmate will be notified of any change resulting from the review process.

The Disciplinary Record

A. A record shall be maintained of all disciplinary proceedings including review by the Warden.

B. The disciplinary record shall include:

1. An appropriate summary of all information produced at a hearing plus the written summary investigation referred to in II (D) above.

2. Physical evidence viewed.

3. A brief explanation of the rationale of the Board's determination.

C. Substantial Evidence

A determination of the Disciplinary Board must be based upon substantial evidence manifested in the record of the disciplinary proceeding. If any of the facts establishing a Board determination are derived from an unidentified informant: (1) the record must contain some underlying factual information from which the Board can reasonably conclude that the informant was credible or his information reliable; (2) the record must contain the informant's statement in language that is factual rather than conclusionary and must establish by its specificity that the informant spoke with personal knowledge of the matters contained in such statement.

D. A complete record of all disciplinary proceedings shall be maintained in the inmate's permanent file.

Part B. Actions Taken by a Disciplinary Board May be as follows:

1. Dismissal of charge.

2. Reprimand.

3. Recommendation to Classification Board for change of status.

4. Temporary loss of specified privileges within inmate classification not to exceed thirty days.

5. One to thirty days placement in punitive segregation.

6. 5 above plus referral to Classification Board with recommendation of reclassification.

7. Loss of good time as prescribed by law under § 13–2–44 of the General Laws.

8. Any combination of 3 through 7 above and/or suspended action on any or all of 3 through 7 above.

Wherever individuals are named in their position of authority, it is permissible in their absence for their lawful substitutes to replace them.

Emergency or Temporary Provisions

When faced with an immediate threat to the security or safety of the Adult Correctional Institutions or any of its employees or inmates, officials of the institution may temporarily reassign inmates in accordance with the following regulations.

I. Reassignment by a correctional officer on approval of his immediate supervisor:

A. When correctional officer or other employee witnesses an inmate commit a serious wrongdoing.

B. When other inmates state that they saw an inmate commit a serious wrongdoing.

C. When inmate seeks safety or protection from others.

II. By supervisory officials of rank of Lieutenant or above, pending investigation:

A. When inmate is suspected of serious wrongdoing, either committed or planned.

B. When inmate is suspected of being a witness to overt acts which constitute a serious violation of institution regulations or a violation of state law.

C. When requested by prosecuting attorney or Superintendent of State Police.

1. When inmate is suspected as perpetrator of a crime.

2. When inmate is a material witness to a criminal act.

Requests under C will be honored upon oral request but shall not be observed beyond 72 hours in absence of receipt by Warden of a written confirmation by requesting authority.

III. All inmates assigned temporarily under the preceding provisions will, as soon as security permits, be informed in writing of the reason for their assignment and will be afforded all other rights due them under institution disciplinary and classification procedures.

IV. A written record of all temporary reassignments shall be forwarded to the Deputy Warden for his concurrence or nonconcurrence, and he shall forward the record to the Warden for approval or disapproval. The report showing review of each is to be placed in the inmate's permanent classification file.

V. All temporary assignments shall be reviewed at the next regular meeting of the Classification Board, which in any case will not

exceed one week, and final action by that Board will be ordered without unnecessary delay.

## APPENDIX B

March 11, 1970

Dear Inmate:

Each of you received recently a copy of the proposed Regulations for the Adult Correctional Institution in connection with a civil action pending in the United States District Court in Providence. After careful consideration, the Regulations have been put in force at the A.C.I. However, a number of inmates have raised strong objection to the conditions of punitive segregation. Accordingly, there may be some further legal proceedings in the case.

When you previously wrote to me about the Regulations, you did so under a promise of complete confidentiality. I am now asking those of you who expressed yourselves to me to give me permission to turn your letters over to the attorneys for the plaintiff-prisoners in order to help them prepare for the possible further proceedings. In no case, by no means will these letters be turned over to the prison administration. Of course, if you do not want me to do this, I will honor your request and will preserve your letter in complete confidence under seal. Below you will see two boxes: check the one you wish, put your checked letter into an envelope, seal, and return it to me. These envelopes will be opened only by me.

Very truly yours,

RAYMOND J. PETTINE
United States District Judge

☐ I do not want my previous letter revealed to the attorneys for the plaintiffs.

☐ I hereby give my permission for the court to turn over my previous letter to the attorneys for the plaintiffs.

Signed_____