Joseph MORRIS et al.

v.

Anthony P. TRAVISONO et al.

Ralph Ben DAVID et al.

v.

Anthony P. TRAVISONO et al.

Civ. A. Nos. 4192, 5280.

United States District Court,
D. Rhode Island.

March 8, 1974.

———◆———

Cary Coen, John M. Roney, R. I. Legal Services, Richard A. Boren, Providence, R. I., for plaintiffs in Civ.A. No. 4192.

Richard Israel, Atty. Gen. of R. I., Donald P. Ryan, Asst. Atty. Gen., Ira L. Schreiber, Edward F. Burke, Everett A. Petronio, Providence, R. I., for defendants in Civ.A. No. 4192.

Ralph J. Gonnella, Thomas C. Angelone, Richard A. Boren, Providence, R. I., Max D. Stern, Boston, Mass., Stanley A. Bass, New York City, for plaintiffs in Civ.A. No. 5280.

Donald P. Ryan, Asst. Atty. Gen., Raymond R. Coia, Providence, R. I., for defendants in Civ.A. No. 5280.

## OPINION AND ORDER

PETTINE, Chief Judge.

This is an action in the nature of Motion for Further Relief pursuant to 28 U.S.C. § 2202 seeking an injunction based on a declaratory judgment and decree entered by this court on April 20, 1972, in Morris v. Travisono, 310 F. Supp. 857 (D.R.I.1970).

A review of the travel and some of the historical facts is necessary to fully appreciate the present controversy between inmates of the Adult Correctional Institution ("ACI") and the Rhode Island officials who administer and operate that facility. In one form or other this has been a four year serial of continuous agitation between the litigants. In some consecutive incidents the parties have admirably reconciled their differences after employing the intervention of the court. However, this case, pressed to a conclusion, necessitates a court ruling.

### Findings of Fact

Based upon certain stipulated facts and on the testimony offered at a hearing on this motion, as well as testimony offered at the hearing for a preliminary injunction in Ben David v. Travisono, C.A. No. 5280 (August 8–10, 1973), the transcript of which, by agreement of the parties, is made a part of this record, the court makes the following finding of facts reiterating much of the stages of the litigation as is set out in Morris v. Travisono, *supra.*

On October 11, 1969, an inmate, Joseph Morris, filed Civil Action No. 4192 against Anthony Travisono, then Commissioner of Social Welfare, who at the time had jurisdiction over the Adult Correctional Institutions, and Acting Warden, John Sharkey, alleging certain brutal conduct in violation of the Eighth and Fourteenth Amendments to the Constitution. After the commencement of the trial on an amended complaint, the hearing was suspended so that the parties might discuss a possible resolution of the case. As a result of these negotiations, overseen by the court, a detailed set of procedures for the disciplining and classification of prisoners was approved by me and incorporated in an interim consent decree. The court retained jurisdiction for eighteen months while the parties continued their efforts to formulate a final decree and set of rules. To their great credit this was accomplished and on April 20, 1972 a judgment was entered as a final decree establishing "Regulations Governing Disciplinary, Classification, and Mail Procedures for all inmates at the Adult Correctional Institutions, State of Rhode

Island." (hereinafter referred to as the "Morris Rules").[1]

No injunctive relief was added to the declaration in the final decree because defendants agreed to adopt the "Morris Rules" and promulgate them pursuant to the Rhode Island Administrative Procedures Act (hereinafter "APA"), R.I. Gen.Laws sec. 42–35–1 et seq. within ninety (90) days of the judgment. This was done on October 10, 1972 and then filed with the Secretary of State on October 12, 1972.

Commencing in April 1973 a parade of horribles set in at the prison. On the 2nd there was an extensive riot in the maximum security section which resulted in a quarter to one half million dollars worth of damages; on May 27, an inmate was stabbed to death; June 22, was marked by the tragedy of a correctional officer being murdered by an inmate; additionally numerous other incidents took place including an alleged es-

cape plot. In the end it became necessary to call upon the State Police to assist in the administration of the correctional duties.

On May 7, a new warden was appointed and finally on June 22, the defendant Travisono instructed the Secretary of State to suspend the "Morris Rules". The defendants effected this suspension by letter to the Secretary of State without filing any motion to modify or vacate this Court's judgment of April 20, 1972.[2]

At the hearing before me, the Warden stated as follows:

a) that he was advised by members of the State Attorney General's office, that to give the inmates, charged with the various violations resulting from the disturbances recited, *supra*, notices and hearings as required by the "Morris Rules" might prejudice the criminal cases being investigated by the state;

---

1. "JUDGMENT

Complaint was filed in the above-entitled proceedings as an individual and class action seeking declaratory and injunctive relief as to allegedly unconstitutional prison disciplinary and classification procedures. This Court issued an interim consent decree on March 10, 1970 and has since that time retained jurisdiction over this matter.

Pre-trial conference having been had, counsel for the respective parties having agreed thereto, the members of the class having been duly notified and given opportunity to indicate any substantial objections to this order, and there being none it is

ORDERED, ADJUDGED, DECLARED, AND DECREED

1. That plaintiffs and members of their class are entitled to those minimum procedural safeguards with respect to classification and discipline as are set out in the classification and disciplinary rules of the 'Regulations Governing Disciplinary, Classification, and Mail and Procedures for all Inmates at the Adult Correctional Institutions, State of Rhode Island', part of the copy attached hereto which Defendants agree to promulgate pursuant to sec. 42–35–1, sec. 42–35–3(a) et seq. of the Rhode Island General Laws within ninety days from the date of this order and incorporate into a new inmate guide within a reasonable time thereafter."

2. June 22, 1973

"Robert F. Burns, Secretary of State
State House
Providence, R. I.
Dear Mr. Burns:
Due to the emergency situation existing at the Adult Correctional Institutions, the regulations governing disciplinary, classification and mail procedures for all inmates at the State Institutions as promulgated pursuant to Title 42, Chapter 35, section 33 [3], State of Rhode Island 1956 (1969) reenactment as amended and filed with the Secretary of State, State of Rhode Island, together with the regulations governing involuntary transfers of inmates, filed with the said Secretary of State on May 24, 1973, are hereby suspended until further order.

Peace,
/s/ Anthony P. Travisono
Director"

In suspending the "Morris Rules" defendants did not comply with the emergency provisions of the Administrative Procedures Act, R.I.Gen.Laws sec. 42–35–1, et seq., under which the Rules were originally promulgated pursuant to the agreement recited in the Judgment of April 20, 1972. It is questionable whether the Director's letter of June 22, 1973, *supra*, complies with the written declaration of reasons required by G.L. 42–35–3(b). Nor was the suspension renewed after 120 days, as required by sec. 42–35–3(b).

b) the disciplinary hearings were "unworkable" in that they led to fights between the inmates and guards and between the inmate being charged and inmate witnesses and that the prison staff was reluctant to administer such hearings during the suspension period;

c) he couldn't even follow the "emergency provisions" of the "Morris Rules", which permit a temporary reassignment of an inmate by a guard or supervisory official without prior hearing, because eventually the staff members' unilateral determination would have to be reviewed at a disciplinary hearing; the Warden flatly stated he could not allow this under the circumstances;

d) compliance with the "Morris Rules" was "a hassle all the way".

Additionally, he testified that the ACI was understaffed during the period leading up to and following the suspension of the "Morris Rules", apparently offering that fact in further justification for his determination that disciplinary hearings were simply impossible.

From June 22, 1973 to the date of the hearing on this motion, December 10, 12, 1973, the "Morris Rules" were suspended and there is some conflict as to exactly what took place during this period at the institution regarding disciplinary and classification procedures.

However, it appears that beginning on June 22, there was a general lockup [3] for eighteen days after which different sections were opened on a trial basis. Visitation rights were restored after two weeks but according to the Warden's

testimony the prison did not return to "normal" until late November 1973.

Since June 22, 1973 approximately eighteen inmates have been transferred, without the benefit of any procedural safeguards, to the "Behavioral Correction Unit" ("BCU"), a segregated cellblock in the Maximum Security Section, as a result of information given to the Warden from inmate informants alleging these men were involved in the aforementioned escape plot; and as of the date of the hearing on this motion 11–13 of these inmates were still there.

It must be noted that on August 6, 1973 part of the rules governing mail procedures at the institution was reinstituted by the defendants; and on November 26, 1973, while not reinstituting the "Morris Rules", as such, the defendants did promulgate without sanction or notification to this court new rules of procedural due process and classification (hereinafter "Revised Rules") and filed such rules with the Secretary of State, pursuant to the emergency provisions of the R. I. Administrative Procedures Act, R.I.G.L. sec. 42–35–1 et seq.[4]

Though I have made these findings of fact, I need not discuss them in relation to their legal implications. For the purpose of rendering injunctive relief, I need only consider the fact, as I do find and explain infra, that as of July 5 a state of emergency no longer existed at the "ACI"; order and safety had been restored; and that, nevertheless, the defendants deliberately and intentionally did not reinstitute the "Morris Rules"

3. A general lockup, as described by the Warden, involved all of the inmates in Maximum Security being locked in their cells twenty-four hours a day, and generally fed in the cells. Only certain workers were allowed out (cooks, etc.) and all visits were suspended. Inmates were let out for showers, and at times for food, in small groups.

4. At the request of the Court, the parties were asked to outline the distinctions between the "Morris Rules" and the "Revised Rules". The record is somewhat garbled as to whether the Court now has before it the question of whether the "Revised Rules" are reasonable substitutes for the "Morris

Rules", which were found by the Court to afford those minimum safeguards guaranteed by due process. *See* Transcript of Hearing on Motion for Further Relief, 109–119.

However, since it is clear that plaintiffs have strenuous objections to certain of the "Revised Rules", and since the record is not complete as to all of the modifications, I reserve ruling on that issue. Any further examination of this issue must deal with the justification put forward by the defendant for each of the recommended revisions, as well as legal analysis of whether the proposed changes dilute the Constitutional safeguards provided for in the original "Morris Rules".

but rather continued to disregard any and all procedural due process rights to which the prisoners were entitled.[5]

There is no evidence in this record that the events recited had been caused by the "Morris Rules".

## CONCLUSIONS OF LAW

■ The court readily asserts that a temporary deprivation of due process hearing requirements prior to disciplinary action may be justified under exigent circumstances. Indeed, the "Morris Rules" embody "Emergency or Temporary Provisions".

#### "Emergency or Temporary Provisions

When faced with an immediate threat to the security or safety of the Adult Correctional Institutions or any of its employees or inmates, officials of the institution may temporarily reassign inmates in accordance with the following regulations.

I. Reassignment by a correctional officer on approval of his immediate supervisor:

A. When correctional officer or other employee witnesses an inmate commit a serious wrongdoing.

B. When other inmates state that they saw an inmate commit a serious wrongdoing.

C. When inmate seeks safety or protection from others.

II. By supervisory officials of rank of Lieutenant or above, pending investigation:

A. When inmate is suspected of serious wrongdoing, either committed or planned.

B. When inmate is suspected of being a witness to overt acts which constitute a serious violation of institution regulations or a violation of state law.

C. When requested by prosecuting attorney or Superintendent of State Police.

1. When inmate is suspected as perpetrator of a crime.

2. When inmate is a material witness to a criminal act.

Requests under C will be honored upon oral request but shall not be observed beyond 72 hours in absence of receipt by Warden of a written confirmation by requesting authority.

III. All inmates assigned temporarily under the preceding provisions will *as soon as security permits, be informed in writing* of the reason for their assignment and will be afforded all other rights due them under institution disciplinary and classification procedures.

IV. A written record of all temporary reassignments shall be forwarded to the Deputy Warden

---

5. By stipulation, the parties have submitted certain post-hearing affidavits. Inmate Arthur Mottram, in an affidavit dated December 20, 1973, states that he was disciplined and given thirty days in segregation and that no disciplinary or classification hearings were held in relation to his discipline as of the date of the affidavit. A similar statement is made by inmate Ronald Labonte, by way of affidavit. In other words, subsequent to November 26, 1973, the date on which the "Revised Rules" were supposed to have been promulgated, certain inmates were still being disciplined without proper compliance with due process safeguards. The Acting Deputy Warden, Fred Chiarini, states by way of affidavit that inmates Labonte and Mottram were denied hearings "due to the work load and shortage of manpower", which resulted in confusion in the adoption of new rules of disciplinary procedures at the Medium facility, and have since been released from segregation. He states that subsequent to December 5, 1973, all disciplinary infractions have been resolved by the use of disciplinary hearings after serving of notice. The Warden states that all those inmates housed in B.C.U. unit as of December 28, 1973, would be afforded hearings within the two week period commencing December 31, 1973.

for his concurrence or nonconcurrence, and he shall forward the record to the Warden for approval or disapproval. The report showing review of each is to be placed in the inmate's permanent classification file.

V. All temporary assignments shall be reviewed at the next regular meeting of the Classification Board, which in any case will not exceed one week and final action by that Board will be ordered without unnecessary delay." (emphasis added)

See Gomes v. Travisono, 490 F.2d 1209, at 1215 (1st Cir. 1973); Biagiarelli v. Sielaff, 483 F.2d 508 (3rd Cir. 1973); Hoitt v. Vitek, 361 F.Supp. 1238 (D.N.H.1973); Urbano v. McCorkle, 334 F.Supp. 161 (D.N.J.1971), aff'd 481 F.2d 1400 (3rd Cir. 1973).

■ However, "[A]fter the immediate crisis is past, the relative importance of the inmates' interest in a fair evaluation of the facts increases and the state's interest in summary disposition lessens . . . " United States ex rel. Miller v. Twomey, 479 F.2d 701, 717–718 (7th Cir. 1973); See Allen v. Nelson, 354 F.Supp. 505 (N.D.Cal.1973); Carter v. McGinnis, 320 F.Supp. 1092 (W.D.N.Y.1970); Smoake v. Fritz, 320 F.Supp. 609 (S.D.N.Y.1970). Therefore, even if the summary imposition of punitive segregation is justified initially, due process safeguards must be afforded to an inmate with all deliberate speed at some time meaningfully close to the effective date of the disciplinary action. Gomes v. Travisono, *supra*; Biagiarelli v. Sielaff, *supra*; Urbano v. McCorkle, *supra*; Carter v. McGinnis, *supra*. This is the essence of the "Emergency or Temporary Provisions" of the "Morris Rules". This measure is an integral component of the due process safeguards constitutionally required with which the defendants refused and failed to comply thus violating the court's judgment of April 20, 1972. This judgment is the authoritative final decree judicially determinative of the rights and obligations of the parties. Having established the minimally required procedural safeguards as guaranteed by the Fourteenth Amendment, as sought in the plaintiffs' amended complaint, and having provided emergency measures, it precluded the defendants from summarily suspending the rules; and it is particularly disturbing that such total suspension spanned approximately five months. Zimmerman v. Mutual Life Insurance Co. of New York, 156 F.Supp. 589 (D.C.Ala.1957). Furthermore, the plaintiffs argue well that the April 20, 1972 judgment as a consent decree had, "the same force and character as a judgment rendered following a contested trial. Kiwi Coders Corp. v. Acro Tool and Die Works, 250 F.2d 562 (7th Cir. 1958) and is subject to res judicata principles, Stuyvesant Ins. Co. v. Dean Const. Co., 254 F.Supp. 102 (D.C.N.Y.1966) aff'd 382 F.2d 991 (2d Cir. 1967); Brunswick Corp. v. Chrysler Corp., 287 F.Supp. 776 (D.Wis.1968) and amounts to an adjudication of plaintiffs' right of recovery. See e. g., A. D. Juillard and Co., Inc. v. Johnson, 166 F.Supp. 577, 585 (S.D.N.Y.1957) aff'd 259 F.2d 837, cert. denied, 359 U.S. 942, 79 S.Ct. 723, 3 L.Ed.2d 676."

■ The defendants argue they had the right to suspend the "Morris Rules" in accordance with the "APA." This approach misses the mark, for they fail to recognize, as has already been stated, that the emergency provisions are a vital constituent element of due process and that the "Morris Rules" is the empowering authority for the due process standard which cannot be derogated. The total suspension effected by the defendants thus justifies the invocation of this court's residual power to now issue a permanent injunction even though the original decree contained no such provision. 28 U.S.C. § 2202; 6 Moore, Federal Practice (1953 ed. 1956 supp.) sec. 57.10; Vermont Structural Slate Co., Inc. v. Tatko Brothers Slate Co., Inc.,

253 F.2d 29 (2d Cir. 1958). The defendants' conduct is posited on no legal authority.

I do not take issue with the defendants' contention that under the laws of the State of Rhode Island, the Director of Corrections has the authority to provide for the control and discipline of the inmates and to make all lawful and necessary rules for the internal policing of the institution. See R.I.Gen.Laws sections 13–1–1, 13–1–2 (Supp.1972); but here we are speaking of the deprivation of a constitutional right recognized by the defendants when embodied in the final consent judgment of this court. The ultimate formulation and entry of that judgment was slow in the making because the court was well aware that judicial intervention into the area of due process rights for individuals under custodial authority is a delicate task. Chief Judge Coffin recognized the problem in Palmigiano v. Baxter, No. 73–1088 (1 Cir. 1973), 487 F.2d 1280.

"The task is a delicate one for courts because of the sensitive and precarious nature of correctional institutions. Prison officials, facing complicated and combustible situations each day, must be free to make a wide range of decisions. Much must be left to their good faith discretion. Sawyer v. Sigler, 445 F.2d 818 (8th Cir. 1971); Marnin v. Pinto, 463 F.2d 583 (3d Cir. 1972). Time has proved, however, that blind deference to correctional officials does no real service to them. Judicial concern with procedural regularity has a direct bearing upon the maintenance of institutional order; the orderly care with which decisions are made by the prison authority is intimately related to the level of respect with which prisoners regard that authority. There is nothing more corrosive to the fabric of a public institution such as a prison than a feeling among those whom it contains that they are being treated unfairly." Id. at 1283.

This rationale is evident in the almost two year process preceding the final approval of the "Morris Rules". They were conceived in turmoil with a continuum of an eighteen month gestation period overseen by this court while counsel for all litigating parties indefatigably negotiated. They finally came into being as a consent judgment. That they are workable rules has been recognized by the First Circuit Court of Appeals in Palmigiano v. Baxter, *supra*.

"We are fortunate in this case to have a set of rules for due process within prison that was carefully shaped by prisoners and correctional administrators working together under the aegis of the district court. The *Morris* rules have provided a workable and useful standard for measuring the extent to which due process safeguards are required in correctional decisions which may result in punitive segregation, loss of good time, and changes in classification. Moreover, the standard is substantially the same as that employed elsewhere within this circuit, see Collins v. Hancock [354 F.Supp. 1253 (D.N.H.1973)], *supra*; Meola v. Fitzpatrick [322 F.Supp. 878 (D. Mass.1971)], *supra*, and conforms in large part to the standard set out in model legislation." Id. at 1286.

The defendants chide the plaintiffs for their "incredible insensitivity" to the tense situation which led up to the suspension of the "Morris Rules." In doing so they fail to recognize that they had the right to invoke the emergency provisions of the rules which virtually affords the same latitude they employed in segregating inmates during the emergency. Instead of following this prescribed procedure, the defendants suspended the rules in their entirety and even when the crisis ended displayed a remarkable insouciance toward the court's judgment by continuing to deny to the plaintiffs the right required and protected by the Due Process clause of the Fourteenth Amendment to the Unit-

ed States Constitution. See Palmigiano v. Baxter, *supra*, McDonnell v. Wolff, 483 F.2d 1059 (1973), cert. granted, 414 U.S. 1156, 94 S.Ct. 913, 39 L.Ed.2d 108 (1974) ; United States ex rel. Miller v. Twomey, *supra*; Gray v. Creamer, 465 F.2d 179 (3rd Cir. 1972) ; Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. denied 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972) ; Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971).

■ The testimony developed at the hearing establishes that the immediate crisis was well in hand by July 5. The record is clear the Warden stated tensions had declined by June 22; by June 29th the serious offenders had been removed from the general population and on the 5th of July the prison was opened to visitors with the Warden in complete physical control of the facility. From this point on there was no justification for the continued suspension of the "Morris Rules"; and if support is sought in the Attorney General's advice, it is misplaced. The contention by the state's prosecutor that future criminal prosecutions for alleged disciplinary infractions within the prison justified the defendants' action does not comport with fundamental principles of procedural due process. See United States ex rel. Walker v. Mancusi, 338 F.Supp. 311, 314–315 (W.D.N.Y.1971) aff'd 467 F.2d 51 (2d Cir. 1972). In fact, the First Circuit found that certain due process principles even *beyond* those enunciated in the "Morris Rules" are necessary precisely because an inmate charged with a disciplinary infraction may be facing a future criminal prosecution concerning the same offense. Palmigiano v. Baxter, No. 73–1088 (1st Cir. 1973) 487 F.2d 1280.[6]

■ Finally the defendants argue that an injunction would now be moot since a substitute set of due process rules ("Revised Rules") have been promulgated by the defendants. However, in light of the defendants' failure to comply with the "Morris Rules" and their continued violations even after Nov. 1973 (see N. 5), I feel an injunction is particularly appropriate. It is clear that "the court's power to grant injunctive relief survives discontinuance of the illegal conduct". The case is not moot unless the defendants can demonstrate that there is no reasonable expectation that the wrong will be repeated. United States v. W. T. Grant, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). The defendants' assertions in this regard by way of affidavit, that due process hearings are now being held as against the record in this case, offers insufficient assurance to this court that the Rules will not again be totally ignored at some future date. Atlantic Richfield Co. v. Oil Chemical and Atomic Workers Int'l Union, 447 F. 2d 945 (7th Cir. 1971) ; Lankford v. Gelston, 364 F.2d 197 (4th Cir. 1966) ; Bailey v. Patterson, 323 F.2d 201 (5th Cir. 1963) ; Landman v. Royster, *supra*. See also Hanover Fire Insurance Co. v. Nieves Hidalgo, 147 F.Supp. 678 (D.P. R.1957).

In granting injunctive relief to the plaintiffs, this court tracks the language in Palmigiano v. Mullen (1st Cir. 1974) 491 F.2d 978 and stresses that only ". . . unusual case[s], involving marked departure [from the "Morris Rules"] which might give rise to a supportable claim of constitutional deprivation . . ." (Id. p. 980) shall have cognizance before this court. This is

---

**6.** "Where the possibility exists of the inmate being penalized for the same criminal conduct in a disciplinary hearing and a criminal trial, he should be entitled to 'use' immunity for statements he might make within the prison disciplinary hearing. (citations omitted) The provision of use immunity reflects a rational accommodation between the imperatives of the privilege against self-incrimination and the legitimate requirements of prison disciplinary procedures." Palmigiano v. Baxter, *supra*.

such a case. Within the context of this admonition it is hereby

ORDERED

That the defendants, their successors and any person acting under them are enjoined from suspending the "Regulations Governing Disciplinary and Classification Procedures at the Adult Correctional Institutions, State of Rhode Island" attached to and incorporated in the judgment entered in this matter on April 20, 1972 and

It is further ordered that the defendants are granted leave for the period, of one week next following the docketing of this opinion to move the court for the adoption of those certain provisions of the "Revised Rules" not decided in this case. (see n. 4.).

## ADDENDUM TO OPINION AND ORDER

Constitutional strictures rightfully limit the scope of the Court's intervention in disciplinary, classification and mail procedures for inmates at the "ACI." Only a claim of constitutional dimension can actuate this Court's jurisdiction; however, this is not always subject to simple solution. Therefore, realizing that in a prison setting prison officials "must be free to make a wide range of decisions" without the coercive fear of violating the Court's injunctive restrictions; that the failure to identify the unusual case markedly departing from the minimal procedures established by this Court may well be caused by a misinterpretation or lack of understanding of the true nature of the case and the constitutional problems involved; that not all changes in the "Morris Rules" should require the approval of this Court, I shall submit to these litigants for consideration and comment, prior to promulgation as a court order, a procedural guideline and suggested format for the changing or modification of the Rules by the prison officials without first seeking the sanction of this Court.