**Mark R. CUGINI, Petitioner,**

v.

**Donald R. VENTETUOLO, Acting Director of the Rhode Island Department of Corrections, John J. Moran, Director of the Rhode Island Department of Corrections, Paul Shulver, Chief of Classification, Berry Shea, Senior Classification Counselor, and John/Jane Does, various agents of the Rhode Island Department of Corrections, Respondents.**

Civ. A. No. 9–0540L.

United States District Court,
D. Rhode Island.

Jan. 2, 1992.

Mark R. Cugini, pro se.

Michael B. Grant, Legal Services, R.I. Dept. of Corrections, Cranston, R.I., for respondents.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

### I. INTRODUCTION

This case arises out of the administrative classification procedures applied to petitioner Mark R. Cugini at the Adult Correctional Institutions ("ACI") in Cranston, Rhode Island. Cugini has been incarcerated at the ACI since February 15, 1985, serving concurrent sentences of three and twelve years. On several occasions, Cugini has appeared before the classification board at the ACI for hearings, following which the board has consistently denied Cugini an upgrade in classification from medium to minimum status. Cugini's appearances before the parole board have also resulted in denials of parole because Cugini had not yet advanced through the prison system.[1]

On November 1, 1990, Cugini filed what he styled as a Motion to Adjudge the Department of Corrections in Contempt of Court because it had denied him access to

---

**1.** As of the release of the Magistrate Judge's report on June 13, 1991, Cugini had been granted minimum security status. This did not moot the case, however, because Cugini alleges that the denial of minimum security status until that time deprived him of access to rehabilitation and parole.

minimum/work release status, in violation of the rules established under *Morris v. Travisono*, 310 F.Supp. 857 (D.R.I.1970) (*Morris* I) [hereinafter "Morris rules"]. Cugini further alleged that respondents had violated his equal protection rights, his eighth amendment rights, and his procedural due process rights. Respondents denied all allegations and subsequently moved the Court to dismiss the action for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). The Court referred the matter to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b).[2] The Magistrate Judge recommended that the respondents' motion to dismiss be granted, to which Cugini filed his objections.

■ Ordinarily, this Court would conduct a *de novo* review of the Magistrate Judge's report upon objections by a party. 28 U.S.C. § 636(b)(1)(B); Rule 72(b). In footnote three of his report, however, the Magistrate Judge stated, "I have treated the plaintiff's 'Motion to adjudge the Department of Corrections in Contempt of Court' as an application for a writ of habeas corpus under 28 U.S.C. § 2254." *Cugini v. Ventetuolo*, No. 90–0540, slip op. at 1 n. 3 (D.R.I. June 13, 1991) (Magistrate Judge's Findings and Recommendations). In so doing, the Magistrate Judge erred. An application for a writ of habeas corpus is a challenge by an inmate that the state has incarcerated him in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254. Although a writ of habeas corpus may be used to challenge the conditions under which an inmate is confined, Cugini did not choose to file a motion for habeas corpus relief. Nevertheless, the Magistrate Judge's recommendation that Cugini's Motion be dismissed is correct. The Court will now explain why this is so.

## II. HISTORY OF THE MORRIS RULES

They were conceived in turmoil with a continuum of an eighteen month gestation period overseen by this court while counsel for all litigating parties indefatigably negotiated. They finally came into being as a consent judgment. That they are workable rules has been recognized by the First Circuit Court of Appeals in *Palmigiano v. Baxter*, [487 F.2d 1280 (1st Cir.1973) ].

So said Judge Pettine of this Court describing the Morris rules in *Morris v. Travisono*, 373 F.Supp. 177, 183 (D.R.I.1974) (*Morris* II). In addition to establishing procedures for the classification and discipline of inmates at the ACI, the Morris rules spell out privileges and restrictions for each classification, establish minimum conditions of confinement, and enumerate those inmate actions that constitute punishable conduct. The current incarnation of the Morris rules is found in *Morris v. Travisono*, 499 F.Supp. 149, 161 (D.R.I.1980) (*Morris* IV). The rules arose in the following manner.

On September 27, 1969, following a sit-in by inmates at the ACI for better food, rehabilitation, and vocational opportunities, twenty-three inmates were segregated without notice or a hearing and placed in the Behavioral Control Unit ("BCU"), a secure facility within the ACI. These inmates were not permitted to bring with them any personal articles, were not given soap, toilet paper, or toilet articles for several days, and were not permitted to shower for two weeks. They were also prevented from speaking with their attorneys until October 3, 1969.

On September 28, 1969, the segregated inmates began a food strike after their water was shut off. When the food trays piled up in their cells, the inmates threw

---

**2.** Cugini objects to the Magistrate Judge's involvement in this case because Cugini never consented to have the case go before the Magistrate Judge. Consent of the parties, however, is not required where a District Court refers a prisoner petition challenging conditions of confinement to a Magistrate Judge to make findings and recommendations. Rule 72(b). Pending referral to the Magistrate Judge, this Court retained ultimate authority over the matter, with the power to accept, reject, or modify the Magistrate Judge's report. 28 U.S.C. § 636(b)(1)(B); Rule 72(b). Cugini's consent or lack thereof, therefore, is of no consequence in these proceedings.

them out into the hall along with other waste products, creating an unhealthy situation in the cellblock. After several days most of the inmates cleaned up their areas after being permitted to shower. One section of the BCU occupied by six men (including the named plaintiff, Joseph Morris) was ordered to clean its area before showering. These six inmates refused to do so, and a standoff ensued between the inmates and the administration during which the unsanitary conditions continued unabated.

On Saturday, October 11, 1969, the Rhode Island Legal Services filed a civil action on behalf of Morris and the other BCU inmates against the Rhode Island Commissioner of Social Welfare, Anthony Travisono, and the Rhode Island prison authorities. The complaint included an application to enjoin the prison administration from keeping the twenty-three inmates in the BCU, where the filthy conditions allegedly amounted to a violation of the eighth amendment prohibition against cruel and unusual punishment.

Refusing to act *ex parte*, Judge Pettine spent the rest of his Saturday evening in conference with all concerned parties. He was satisfied that a severe health hazard existed as to the six inmates who had refused to clean their area, and he arranged for a doctor to visit the BCU to determine the extent of that hazard. Judge Pettine also ordered the administration not to prohibit the inmates in the BCU from exercise or religious observances. On Sunday, October 12, 1969, a doctor visited the BCU and reported back to the Judge on the conditions that he had found there. He concluded that the cellblock was quite dirty but posed no immediate threat to the inmates if they were careful and hygienic; he also found no risk to the rest of the prison population. The inmates were dissatisfied with this report.

The formal hearing commenced on Monday, October 13, 1969, with four of the inmates testifying. The Court found that the allegations constituted violations of the eighth, fifth, and possibly sixth amendments of the U.S. Constitution. The hearing continued the next day with several inmates and prison officials testifying. In effect, what had begun as a hearing on a motion for preliminary injunction evolved into a hearing on the merits of the case. On Wednesday, October 15, 1969, significant progress was made when four of the six inmates in the filthiest area of the BCU agreed to clean up their cellblock in return for showers, personal hygiene articles, and opportunities for religious activity.

The following day the hearing was suspended while the parties attempted to negotiate an agreement, but they were unsuccessful. The inmates returned on Friday, October 17, 1969, to request a continuance so that they could thoroughly prepare their case and confer with experts on penal administration. Their chief counsel was also too mentally and physically exhausted to proceed. The Court announced that it intended to grant the continuance but was concerned with the status of the inmates in the interim. The prison administration proposed that the twenty inmates remaining in the BCU be reclassified to B status (segregation within the general prison population) pending reclassification hearings. The hearings would be based upon their conduct from that day forward and all prior conduct, excluding the time between the September 27, 1969 segregation and the October 15, 1969 cleanup; the cleanup itself would be considered as a mitigating factor. Those twenty inmates would remain in B status, or be reclassified to A status (general prison population) or C status (physical segregation in the BCU), but none would be downgraded to D status (restrictive physical segregation). The inmates agreed, and the Court entered the plan as a temporary order to be in effect until the hearing reconvened.

On December 15, 1969, the inmates amended their complaint to allege a class action on behalf of all inmates at the ACI. They asserted that the classification and disciplinary procedures then in use at the ACI were unconstitutional. The parties continued their negotiations.

Early in January 1970 the parties submitted to the Court the results of their extended negotiations: a draft of the pro-

posed "Regulations Governing Disciplinary and Classification Procedures at the Adult Correctional Institutions, State of Rhode Island." *See Morris* I, 310 F.Supp. at 865 app. A (text of original rules). Several of the inmates, particularly those still in the BCU, objected to the proposed rules. In order to evaluate their objections, the Court ordered copies of the rules to be distributed to all inmates, along with materials for them to submit their uncensored objections, comments, or approval directly to the court.

On March 11, 1970, after carefully reviewing the inmates' responses, the Court issued its Memorandum and Order in which it detailed the proceedings of the previous five months and addressed the inmates' objections. *See Morris* I, 310 F.Supp. 857. The Court stated that the proposed rules were to become part of an Interim Consent Decree issued that same day by the Court, over which the Court would retain jurisdiction for eighteen months. This gestation period would allow the parties to effectuate the rules and make any necessary alterations before the Court issued its final decree. *Id.* at 862.

Various amendments to the rules were submitted to the Court and approved during the eighteen-month period. On April 20, 1972, the Court entered its Final Decree, declaring that the inmate class was "entitled to those minimum procedural safeguards with respect to classification and discipline as are set out in the [Morris rules]." *Morris v. Travisono*, No. 4192 (D.R.I. April 20, 1972) (final decree). Rather than issue an injunction, the Court stated in its decree that the prison administration agreed to promulgate the Morris rules pursuant to the Rhode Island Administrative Procedures Act, General Laws §§ 42–35–1 to –18 within ninety days. *Id.* On October 10, 1972, three years after commencement of the civil action, the prison administration filed the official version of the rules with the Rhode Island Secretary of State. Thus the Morris rules came to life, but their existence was far from assured.

On June 22, 1973, the prison administration unilaterally suspended the Morris rules following such turbulent events as a prison riot, the murders of an inmate and a correctional officer, the discovery of an escape plot, and the appointment of a new prison warden. Seventeen inmates were segregated in the BCU without notice or a hearing. The prison returned to normal by late November 1973, but the rules were not reinstated.

On December 10 and 12, 1973, the Court heard arguments on the inmates' Motion for Further Relief seeking an injunction based upon the Court's final decree of April 20, 1972. *See Morris* II, 373 F.Supp. 177. The Court determined that the state of emergency had ended on July 5, 1973, but that the prison administration had deliberately not reinstituted the Morris rules, thereby denying the inmates their procedural due process rights. *Id.* at 180–81. Whereas the emergency provisions of the Morris rules had been designed to deal with such a situation, the administration had operated completely outside the scope of the rules and had failed to reinstitute procedural due process safeguards as soon as possible following the restoration of order and safety. *Id.* at 181–82. Because the administration had failed to seek relief from the April 20, 1972 decree before unilaterally suspending the rules, the Court permanently enjoined the prison administration from suspending the rules in the future. *Id.* at 184. The First Circuit affirmed the injunction on appeal. *Morris v. Travisono*, 509 F.2d 1358 (1st Cir.1975) (*Morris* III).

In 1980 Judge Pettine reaffirmed the continued vitality of the Morris rules. *Morris* IV, 499 F.Supp. 149. An inmate segregated in the BCU since June 22, 1973, had brought an action pursuant to 42 U.S.C. § 1983 and a motion to adjudge the prison administration in civil contempt for violating the Morris rules. The prison administration countered with a motion to vacate the Morris rules in light of certain changes in the circumstances at the ACI and in the case law. The Court determined that continued enforcement of the Morris rules would not result in a grievous wrong

to the prison administration and remained necessary to effectuate the goals of the final decree. *Id.* at 157. Therefore, the Court denied the motion to vacate and ordered the administration to comply with the Morris rules in the future. The Morris rules have remained in effect since that time.

### III. DISCUSSION

■ This matter comes before this Court by way of a *pro se* filing. While the Court endeavors to construe *pro se* pleadings liberally, *Ferranti v. Moran*, 618 F.2d 888, 890 (1st Cir.1980), it is clear that even *pro se* plaintiffs must meet certain minimum standards to establish their cases.

> We do not suggest that possibly meritorious claims should be defeated because of mere pleading defects. But we do require even *pro se* plaintiffs to establish, when called upon to do so at a preliminary stage, that their claim has sufficient *prima facie* merit to warrant the bother and expense of a trial.

*Palmigiano v. Mullen,* 491 F.2d 978, 980 (1st Cir.1974).

Unlike many inmates, Cugini chose not to bring a § 1983 action alleging civil rights violations. If he had brought such an action, this Court would certainly have federal question jurisdiction pursuant to 28 U.S.C. § 1331, as the case would arise under the laws of the United States. Nor did Cugini bring a motion for habeas corpus relief, as discussed above. The tenor of Cugini's original pleading is clear: it is a motion to adjudge the prison administration in contempt of court for violating the Morris rules. Cugini reiterates that fact in his Objections to the Magistrate Judge's Findings and Recommendations. Therefore, if the Morris rules are state-made rules, not meant to be enforced in federal court, this case must be dismissed for lack of jurisdiction.

In *Palmigiano* the First Circuit determined that an inmate at the ACI who had filed suit in District Court against the classification board was not obliged to "exhaust state judicial remedies before [bringing] a § 1983 action." 491 F.2d at 979–80.

Were we facing the question *de novo,* much might be said in favor of requiring Palmigiano to exhaust state judicial remedies, as prisoner classification is governed in Rhode Island by constitutionally adequate regulations that were, indeed, recently developed with the assistance of, and approved by, the federal court. *Morris v. Travisono,* 310 F.Supp. 857, 870 (D.R.I.1970). The enforcement of these regulations, which the Rhode Island courts are well equipped to do, would seem at one and the same time to assure Palmigiano of his constitutional rights.

*Id.* at 980. Later, when the prison administration unsuccessfully sought to defend its total suspension of the Morris rules in 1973, it asserted that "the consent decree directed them to follow state law under the Rhode Island Administrative Procedures Act," and section 42–35–3(b) of the Act entitled them to adopt an emergency rule without notice in emergency circumstances. *Morris* III, 509 F.2d at 1361. The First Circuit stated, however:

> [w]hile the consent decree called for enforcement of the Morris Rules under state law, *see Palmigiano v. Mullen,* 491 F.2d 978, 980 (1st Cir.1974), the contention that the Morris Rules themselves may be eliminated under state law is without merit.... The Morris Rules, including the emergency provisions, embodied a binding declaration of constitutional rights and were part of a judgment; the court's final decree specifically says as much.... *Defendants cannot unilaterally order the elimination of rights determined in federal courts simply because the consent decree was to be enforced through state machinery.*

*Id.* (emphasis added); *see also Rodi v. Ventetuolo,* 941 F.2d 22, 26–27 (1st Cir.1991) (Morris rules have force and effect of state law).

Whereas "access to the district court has been, and remains, available to a party seeking to establish what in the Morris Rules is now constitutionally necessary and what is not," *Morris* III, 509 F.2d at 1362, an inmate alleging only violations of the

classification procedures should be relegated to state court. This Court concludes, therefore, that state prisoner actions alleging violations of the Morris rules or seeking enforcement of those rules properly belong in state court because the rules were promulgated under state law and were meant to be dealt with by state machinery. Furthermore, the appeal provisions of the Rhode Island Administrative Procedures Act, section 42–35–15, are available in a situation such as this and might afford a broader scope of review after all administrative remedies have been exhausted.

■ Despite Cugini's assertions that this is a motion to adjudge in contempt for violation of the Morris rules, he has made allegations of a constitutional nature. Assuming that Cugini has attempted to plead a § 1983 case, he has failed to state a cause of action. The Morris rules are *prima facie* constitutional.

> Given the history and constitutional adequacy of Rhode Island's classification standards and rules, it will be the unusual case, involving marked departure by state officials therefrom, which might give rise to a supportable claim of constitutional deprivation.... *To the extent [an inmate] complains simply that the decision of the Classification Board reflects an erroneous judgment, his only remedy is that provided by state law and procedures.*

*Palmigiano,* 491 F.2d at 980 (emphasis added). The Court in *Morris* II quoted *Palmigiano,* stating that only the " 'unusual case[s] involving marked departure [from the Morris Rules]' … shall have cognizance before this court," 373 F.Supp. at 184, and "[o]nly a claim of constitutional dimension can actuate this Court's jurisdiction," *id.* at 185. The circumstances addressed in *Morris* II clearly constituted an unusual case, whereas the circumstances of Cugini's incarceration do not.

■ Cugini claims that he has been denied equal protection of law because he was denied an upgrade in status while other similarly situated inmates were not. The prison administration, however, has the discretion to deal with each inmate as it sees fit, to which this Court must defer. *Ferranti,* 618 F.2d at 890 n. 1. The administration has not exceeded the scope of that discretion merely because it chose to treat Cugini as an individual. Its responsibility is to tailor an adequate rehabilitation program to meet the needs of each inmate, and this Court is in no position to second-guess that task. Accordingly, the Court concludes that an equal protection violation has not been properly pleaded. In fact, Cugini does not even allege which of the Morris rules were violated or how they were violated.

■ Cugini also claims an eighth amendment violation in that his medium security status resigned him to a vegetative state. While this may not have been the most desirable existence, it did not amount to an eighth amendment violation.

> Not every breach of prison regulations will give rise to an Eighth Amendment claim. What counts is whether the official conduct of which the plaintiff complains was in derogation of the constitutionally mandated "deliberate indifference" standard.

*Desrosiers v. Moran,* 949 F.2d 15, 21 (1st Cir.1991); *see also Morris* IV, 499 F.Supp. at 160 (court refused to find seven-year segregation in BCU unconstitutional *per se*). Cugini has been incarcerated as punishment for his crimes. He should not expect every moment of incarceration to provide him with personal fulfillment.

■ Finally, Cugini alleges that a liberty interest arose because he was entitled to have a legitimate opportunity to fulfill the requirements of the parole board before his next parole hearing. Again he misses the point. "There is no federally-protected right to a particular classification nor even to an error-free decision by the state authorities." *Palmigiano,* 491 F.2d at 980. From all that appears from the allegations made, the administration adhered to proper procedure by bringing Cugini before the classification and parole boards for their determinations. It is not a violation of the Morris rules that the boards did not make the determinations that Cugini desired.

**114**

In short, Cugini has not brought a justiciable federal claim before this Court; Cugini has sought simply to remedy what he considers an erroneous judgment by the classification board.

There is no doubt that discipline and administration of state detention facilities are state functions. They are subject to federal authority only where paramount federal constitutional or statutory rights supervene. *Johnson v. Avery*, 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969). This claim, therefore, does not belong in this court.

## IV. CONCLUSION AND ORDER

Accordingly, the respondents' motion to dismiss is hereby granted. The Clerk will enter judgment for the respondents forthwith.

It is so ordered: