OPINION OF THE COURT
Peter M. Wendt, J.
Following trial in this summary holdover proceeding, held on December 7 and 15, 2010, the court sets forth below its findings of fact and conclusions of law.
Petitioner is the owner and landlord of the rent-stabilized apartment 9H, located at 653 East 14th Street, New York, New York (the subject premises), which is located within the Stuyvesant Town apartment complex. In September 2010, petitioner commenced this holdover proceeding against respondent, the rent-stabilized tenant of the subject premises, on the ground of nuisance.
The 10-day notice of termination, dated August 18, 2010 and attached to the petition and incorporated therein by reference, alleges that respondent is
“committing or permitting a nuisance in the Apartment or the building containing the Apartment and/or the apartment complex containing the building; and/or you are maliciously, or by reason of gross negligence, substantially damaging the apartment; and/or you are engaging in a course of conduct, the primary purpose of which is intended to harass the owner or other tenants or occupants of the same by *682 interfering substantially with their comfort and safety.”
The notice of termination details in 10 paragraphs that the nuisance grounds are predicated on respondent allegedly possessing and selling drugs out of his apartment and/or on the grounds of the subject premises. The notice alleges, inter alia, that Drug Enforcement Administration (DEA) agents recovered drugs, drug paraphernalia and money from respondent’s apartment pursuant to a search warrant which was based on surveillance conducted in the vicinity of 14th Street and Avenue B in Manhattan, and that respondent ultimately was charged with and pleaded guilty in federal court to “conspiring to distribute, distributing and possessing with the intent to distribute 500 grams and more of mixtures and substances containing a detectable amount of what is commonly known as ‘crystal meth,’ a controlled substance.” (See para 7 of notice of termination.)
In his answer, respondent denies petitioner’s allegations, and in his second affirmative defense states that he is in full compliance with all the terms of his lease and has fully complied with all provisions of the Rent Stabilization Code. In his third affirmative defense, respondent alleges that petitioner is guilty of laches; in his fourth affirmative defense, respondent states that predicate notices were not properly served; and in his fifth affirmative defense, respondent alleges that building staff have harassed him and have not been providing services.
Admitted into evidence at trial through petitioner was the grand jury indictment (exhibit 2) and the superceding information (exhibit 3).
The indictment (exhibit 2), returned by a grand jury sitting in the United States District Court, Southern District of New York, on May 12, 2009, charges in relevant part:
“COUNT TWO
“3. On or about February 25, 2009, in the Southern District of New York, WILLY FLORENTINO and LEIGH NOVOG, the defendants, and others known and unknown, unlawfully, intentionally, and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.
“4. It was a part and an object of the conspiracy that WILLY FLORENTINO and LEIGH NOVOG, the defendants, and others known and unknown, would and did distribute and possess with the intent *683 to distribute a controlled substance, to wit, 50 grams and more of methamphetamine, its salts, isomers, and salts of its isomers, in a form commonly known as ‘crystal meth,’ in violation of Sections 812, 841 (a) (1) and 841 (b) (1) (A) of Title 21, United States Code. (Title 21, United States Code, Section 846.)
“COUNT THREE
“5. On or about February 25, 2009, in the Southern District of New York, LEIGH NOVOG, the defendant, unlawfully, intentionally, and knowingly, did distribute and possess with the intent to distribute a controlled substance, to wit, 50 grams and more of methamphetamine, its salts, isomers, and salts of its isomers. (Title 21, United States Code, Sections 812, 841 (a) (1), and 841 (b) (1) (A).)”
The superceding information (exhibit 3), submitted by the United States Attorney’s Office on March 9, 2010, to which respondent pleaded guilty, states in relevant part:
“The United States Attorney charges:
“1. From at least in or about 2006, up to and including in or about February 2009, in the Southern District of New York and elsewhere, LEIGH NOVOG, the defendant, and others known and unknown, unlawfully, intentionally, and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.
“2. It was a part and an object of the conspiracy that LEIGH NOVOG, the defendant, and others known and unknown, would and did distribute and possess with the intent to distribute a controlled substance in violation of 21 U.S.C. § 841 (A) (1).
“3. The controlled substance involved in the offense was 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, in a form commonly known as ‘crystal meth,’ in violation of 21 U.S.C. Section 841 (b) (1) (A). (Title 21, United States Code, Section 846.)”
The transcript of respondent’s guilty plea to count one (the only count) of the superceding information was also admitted as evidence at trial as petitioner’s exhibit 4. The relevant portion of the transcript of respondent’s plea follows:
“the court: Mr. Novog tell me what you did.
“defendant novog: On a street in Manhattan, I knowingly gave methamphetamines to another *684 person, a package containing crystal meth to another individual.
“the court: And did you know that the package contained crystal meth?
“defendant novog: Yes, I did, Your Honor.
“the court: And did you have an agreement or understanding with someone—
“defendant novog: Yes
“the court: - - to distribute that crystal meth?
“defendant novog: Yes, I did, your Honor.
“the court: And the other person was someone who was not affiliated with the government?
“defendant novog: That is correct, you Honor.
“the court: Okay, And where was this?
“defendant novog: On a street in Manhattan.
“the court: And when was it, approximately?
“defendant novog: The end of February 2009.
“the court: And so, just so that I’m clear, in February of 2009, thereabouts in Manhattan, you had an agreement or understanding with another person to illegally distribute crystal meth?
“defendant novog: That is correct, your Honor.
“the court: And, in fact, you distributed some crystal meth in a package?
“defendant novog: That’s correct, Your Honor.
“the court: And was there more than 500 grams involved?
“defendant novog: I understand there was more than 500 grams
“the court: All right. And when you entered into that agreement, did you know that wh[at] you were doing was wrong and illegal?
“defendant novog: Yes, your Honor, I did know. “the court: All right Mr. Brown, have I covered the elements of the crime with respect to Mr. Novog? “mr brown: You have, Judge.
“the court: Would you summarize what the government’s evidence would be against Mr. Novog if he were to go to trial?
“mr. brown: The evidence, your Honor, would consist of the testimony of law enforcement and non *685 law enforcement witnesses, including law enforcement witnesses who surveilled the transaction that Mr. Novog has just described and a confidential informant who arranged the transaction. There would also be consensually recorded text messages and phone calls, as well as text messages and phone calls that were intercepted pursuant to Title III. There would be documentary evidence and testimony in the form of a lab report from a DEA chemist who would describe the contents of the package and its purity. And, also, there were some documents that were recovered from Mr. Florentino on that date that would also constitute evidence of the existence of the conspiracy.
“the court: And was it - - did Mr. Novog have an agreement with Mr. Florentino, were they - -
“mr brown: He had agreement with - -
“the court: - - two of the co-conspirators?
“mr brown: They were, your Honor. And there were others. They were both being directed by another individual.
“the court: All right. Mr. Novog, how do you now plead to count one of the superseding information; guilty or not guilty?
“defendant novog: I plead guilty, your Honor.”
At trial, the only witness called by petitioner was the respondent himself. Respondent pleaded the Fifth Amendment and refused to answer most questions by petitioner’s counsel. Petitioner requested that this court draw a negative inference from each question to which respondent refused to answer based upon his Fifth Amendment right to refuse to testify. Petitioner called no other witnesses, neither employees from the subject building, law enforcement witnesses, nor neighbors of respondent to testify as to the drug activity alleged to have occurred in and/or around the subject premises as set forth in the petition.
Respondent was represented by counsel at trial. One of his attorneys was the attorney representing him in his criminal matter. According to that counsel, Ms. Scolari, respondent had not been sentenced yet as of the trial date. The relevant portions of the plea minutes with respect to respondent’s impending sentence are as follows:
“the court: Now, before I can sentence you, I still have to decide what your guideline range is. I can’t *686 do that until after the probation department prepares a presentence report, and you, your respective lawyers, and the government have had a chance to review the report and to make any objections. Do you understand that, Mr. Novog?
“defendant novog: Yes, I do, Your Honor.
“the court: Now, even after I decide what your guideline range is, I still have the authority, in appropriate circumstances, to impose a sentence that is above or below the guideline range. Do you understand that, Mr. Novog?
“defendant novog: Yes I do, your Honor.
“the court: Do you understand that if your attorney or anyone else has attempted to predict what your sentence will be, that the prediction could be wrong. Mr. Novog?
“defendant novog: Yes, I’m aware of that, your Honor.
“the court: That’s because no one, not your attorney, not the government, can or should, make any promise to you as to what your sentence will be, as your sentence cannot be decided until after the presentence report is completed, and I have ruled on any objections to the report, and I have decided whether there is any basis to go above or below the guideline range. Do you understand that, Mr. Novog?
“defendant novog: Yes, I do, your Honor.
“the court: And, finally, do you understand that even if your sentence turns out to be different from what your attorney or anyone else has told you it might be, or even if your sentence turns out to be different from what you expect, you will still be bound to your guilty plea, and you will not be allowed to withdraw your plea of guilty. Mr. Novog?
“defendant novog: Yes, I understand
“the court: Do you understand that you may be waiving or giving up certain aspects of your right to appeal by pleading guilty. Mr. Novog?
“defendant novog: Yes, I understand.”
The matter was then adjourned for sentence to a future date, and the sentencing had not occurred as of the date of trial in the instant matter.
*687 Reviewing petitioner’s evidence with regard to the drug activity upon which petitioner’s notice of termination and petition are based, which includes the indictment, the superceding information, and the plea minutes, the court notes that respondent did not admit to possessing or selling illegal drugs in or around the subject premises, building, or grounds. Petitioner presented no witnesses or documentation to prove that he did.
In his plea allocution, respondent admitted only to selling drugs on one day, “on a street in Manhattan,” and when summarizing the evidence at the plea hearing, the prosecutor referred to a single incident and a single “package” of drugs.
While it is true that respondent pleaded guilty to the entire superceding information, which included having conspired with other individuals from 2006 through 2009 to violate the narcotics laws of the United States (see count one of superceding information, exhibit 3), there were no specific facts presented at the instant nuisance holdover trial as to what conduct of Mr. Novog’s constituted the conspiracy. There was a remarkable absence of any evidence to support petitioner’s nuisance claim in the trial in this matter.
In his defense at trial, respondent presented four credible witnesses: Stefan Kipphorn, Andrew Gensler, Vittoria Repetto, and Hermann Lademann. Each witness testified to having spent significant time with respondent in the subject premises, and never having seen or learned about any drug activity in Mr. Novog’s apartment.
Respondent’s first witness, Stefan Kipphorn, testified that he and respondent have been close friends for over 20 years, having met at antique shows years ago. He testified that he and respondent often went out to eat together, went to museums together, and that he routinely went to respondent’s home to spend time with him, have tea, watch movies, learn about the computer, and talk. Mr. Kipphorn testified that over the past eight years, he would visit respondent’s apartment every other week, although in the past two years it was less because Mr. Kipphorn has been ill. He testified that he uses neither drugs nor alcohol, and at no time over the 20-year period he has known respondent has he observed him using drugs, or using drugs in his apartment. He testified that of all the times he spent in the apartment, he never observed the presence of any drugs there.
Respondent also called Andrew Gensler, his cousin and former roommate, who is a writer for the New York Times and *688 other publications, is in a long-term relationship and has three children, including a newborn. He described his close relationship with Mr. Novog, with whom he spends significant time and with whom he has lived twice since the early nineties, including at the subject premises. Mr. Gensler testified that he and his children have been to respondent’s apartment at least four to six times a year since 2006, including visits since respondent’s arrest. He added that he and his family spent part of the most recent Thanksgiving day at the subject premises with respondent and Mr. Gensler’s mother. He testified that when he visits respondent, they have meals, conversation, play with the children, etc.
When asked, Mr. Gensler testified that he does not use drugs, has never observed Mr. Novog use drugs, and never observed any drug paraphernalia at the subject premises. Mr. Gensler testified that as respondent’s roommate, and in the many times he has visited since, he has had occasion to go through respondent’s drawers and closets and has never observed drugs or drug paraphernalia. He further noted that when he and his minor children visit the subject premises, they are not restricted from going into any part of the apartment.
The third witness called by respondent was Dr. Vittoria Repetto, who has known respondent since 2002. In addition to going to a play together when they first met, respondent and Dr. Repetto attended other events and meals together, and they talked often. Dr. Repetto testified that from 2002 to the present, they would see each other monthly, and that she had been to respondent’s apartment 12 to 15 times during that period, to have dinner, meet before a show, have a glass of wine and talk, etc. Dr. Repetto testified that over these years, she has never seen respondent use drugs, neither in the subject apartment nor elsewhere, and has never observed drugs or drug paraphernalia in the subject premises, to which she was permitted unrestricted access. Dr. Repetto testified as to respondent’s good character and stated that respondent’s arrest has not changed this opinion.
Respondent’s fourth witness was Hermann Lademann, who works for a commercial real estate firm, and met respondent when he was in book publishing, his previous job. They became friends, and Mr. Lademann has spent considerable time with respondent, approximately once per week when he was not traveling to Phoenix for business, since they met in 2001. They have dinner and go to the theater, movies and restaurants. Mr. Lade *689 mann described respondent as an honest, up-front, straightforward, reliable person.
Mr. Lademann described respondent’s apartment in detail and testified that he has spent time there approximately once per week since 2001 when he was in New York and not traveling. He added that he has been in every part of the subject premises and that there has never been any part of the apartment where he was not permitted to go. He testified that he does not use drugs, has never observed Mr. Novog using drugs, and has never observed drugs in the apartment. When asked on cross-examination what he knows about respondent’s arrest, he responded that he was told that respondent was arrested on the street and that it was a drug-related arrest.
Respondent’s attorney gave an offer of proof for a fifth witness, an expert who would explain various circumstances which could require a criminal defendant in respondent’s situation to assert his Fifth Amendment right not to testify. The court denied respondent’s request to call such a witness, and similarly denied respondent’s criminal attorney’s request to go off the record to explain details of respondent’s criminal case. Although the court would not entertain these requests, it is not lost on this court that respondent had not yet been sentenced as of the date of this trial, nor that there may have been other factors in the criminal case that necessitated the invocation of respondent’s Fifth Amendment right.
Petitioner argues that despite the lack of evidence presented at trial, it has sustained its burden of proof in this proceeding based on respondent’s guilty plea to the superceding information along with the negative inference it is requesting that this court draw as a result of respondent invoking his Fifth Amendment right in response to most of petitioner’s questions.
Petitioner maintains that the drug activity which respondent admitted to being involved in when he pleaded guilty falls under the wrongful acts for which a tenant may be evicted on nuisance grounds pursuant to Rent Stabilization Code (9 NYCRR) § 2524.3. Petitioner points out that the nuisance conduct need not have occurred within tenant’s apartment, but it could also occur in the building or property, although petitioner fails to present proof as to where on the property these acts occurred, if at all.
Petitioner also gratuitously informs the court in its posttrial memorandum that there are many playgrounds in Stuyvesant Town/Peter Cooper Village which are used by the children from *690 the complex, but failed to present any evidence that there was ever any allegation in the criminal matter or otherwise that respondent engaged in drug activity in any of the playgrounds or anywhere else in the area owned by petitioner.
Respondent argues that petitioner may not use his invocation of the Fifth Amendment to sustain its burden of proof absent any independent evidence to support a negative inference. Respondent points out that the only evidence admitted at trial supports a finding of an absence of drugs and/or drug activity in the subject premises, and that although this was a civil trial, case law supports an individual’s right to invoke the Fifth Amendment privilege against self-incrimination in any proceeding, criminal or civil, where the answers might incriminate that individual in future criminal proceedings. Notably, respondent had yet to be sentenced as of the date of trial. In any event, argues respondent, “the Fifth Amendment standing alone may not be the basis upon which Petitioner sustains its burden of proof.”
Reviewing the relevant law in this nuisance holdover proceeding, Rent Stabilization Code § 2524.3 states, in relevant part:
“Without the approval of the DHCR, an action or proceeding to recover possession of any housing accommodation may only be commenced after service of the notice required by section 2524.2 of this Part [termination notices], upon one or more of the following grounds, wherein wrongful acts of the tenant are established as follows: . . .
“(b) The tenant is committing or permitting a nuisance in such housing accommodation or the building containing such housing accommodation; or is maliciously, or by reason of gross negligence, substantially damaging the housing accommodation; or the tenant engages in a persistent and continuing course of conduct evidencing an unwarrantable, unreasonable or unlawful use of the property to the annoyance, inconvenience, discomfort or damage of others, the primary purpose of which is intended to harass the owner or other tenants or occupants of the same or an adjacent building or structure by interfering substantially with their comfort or safety.”
Courts repeatedly have held that a tenancy may be terminated when a tenant causes a nuisance by engaging in a “recurrent pattern of objectionable conduct” that substantially threatens *691 the health, safety and comfort of other building occupants. (See Domen Holding Co. v Aranovich, 1 NY3d 117 [2003].) Of course, petitioner must prove such conduct by a preponderance of the credible evidence at trial.
Petitioner relies on the language in the superceding information, and respondent’s guilty plea thereto, that respondent “in or about 2006, up to and including in or about February 2009 . . . and others known and unknown . . . did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States,” as proof that respondent engaged in a “recurrent pattern of objectionable conduct.”
Again, petitioner presented no law enforcement personnel, neighbors, employees, proof of complaints by neighbors, or any other independent evidence as to what this conspiracy involved, or whether there was recurrent, ongoing criminal activity for a period of time such that this element of the nuisance claim could be established. Most important, petitioner produced no evidence showing respondent engaged in such activity in or about the subject premises. Moreover, the activity constituting “conspiracy” is not specified and leaves open to speculation the question of what type of conduct it was, and whether it involved, for example, e-mails, text messages, conversation or meeting with another individual or individuals, or some other related conduct, all of which could have taken place anywhere.
Even if the conspiracy involved these types of communications, there is no evidence that the conspiratorial or unlawful conduct occurred in, around or anywhere near the subject premises. Nowhere in the superceding information nor in respondent’s plea minutes is there any mention of criminal conduct having occurred in the subject premises, in the subject building, or on the subject property of Stuyvesant Town/Peter Cooper Village. To conclude that the broad language in the superceding information with respect to a conspiracy and respondent’s plea establish “a recurrent pattern of objectionable conduct” necessary to establish nuisance necessitates a leap of logic going far beyond any facts in evidence in this matter.
In an apparent attempt to further circumvent the requirement that actual evidence must be produced at trial to establish its nuisance claim, petitioner called respondent to the stand, most likely anticipating respondent’s Fifth Amendment responses to direct examination, which petitioner likely hoped would enable it to request that the court draw a negative inference as *692 to each question respondent refused to answer. The inference petitioner wishes the court to draw is that if respondent is refusing to answer petitioner’s questions, he must have been involved in the drug activity in the subject premises. The problem with this strategy is that while a negative inference may be drawn from one’s refusal to answer questions at trial in a civil matter, this may only be done when there is some independent evidence presented which allows the court to make such an inference.
For this court to infer from respondent’s invocation of the Fifth Amendment that he must have been involved in drug activity in the subject premises versus inferring that he could not risk the effect his answers would have on his sentencing, or that there was yet another reasonable explanation impacting on the criminal case that prevented him from answering, would be neither rational nor just given the total absence of independent evidence in this matter.
The Fifth Amendment to the US Constitution provides that “[n]o person . . . shall be compelled in any criminal case to be a witness against himself.” Courts repeatedly have held that
“[t]his constitutional right against self-incrimination not only provides a criminal defendant with the option to abstain from testifying, but also protects him from any repercussions arising from the exercise of such option. Therefore, the Fifth Amendment prohibits the trier of fact in a criminal case from drawing any adverse inferences as a result of the defendant’s refusal to testify.” (Wechsler v Hunt Health Sys., Ltd., 2003 WL 21998980, *2, 2003 US Dist LEXIS 14594, *6 [SD NY 2003], citing Carter v Kentucky, 450 US 288, 304 [1981].)
The Supreme Court of the United States has further held that the Fifth Amendment privilege against self-incrimination
“not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings” (Baxter v Palmigiano, 425 US 308, 316 [1976], quoting Lefkowitz v Turley, 414 US 70, 77 [1973]; see also Matter of DeBonis v Corbisiero, 155 AD2d 299 [1st Dept 1989]).
*693 The Appellate Division has held that “[t]he constitutional provisions bestowing the privilege against self-incrimination (N.Y. Const., art. I, § 6; U.S. Const., 5th Amendt.) have consistently been construed by the courts in a broad and liberal spirit.” (Bradley v O’Hare, 2 AD2d 436, 439 [1st Dept 1956], citing Quinn v United States, 349 US 155, 162 [1955].) “This right to refuse to testify has been recognized as ‘one of the most valuable prerogatives of the citizen.’ ” (Id., quoting Brown v Walker, 161 US 591, 610 [1896].)
However, “the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment ‘does not preclude the inference where the privilege is claimed by a party to a Civil cause.’ ” (Baxter v Palmigiano at 318 [citation omitted].) “Refusal to answer questions upon asserting the Fifth Amendment privilege is relevant evidence from which the trier of fact in a civil action may draw whatever inference is reasonable under the circumstances.” (Wechsler v Hunt Health Sys., Ltd., 2003 WL 21998980, *2, 2003 US Dist LEXIS 14594, *7, quoting Brink’s Inc. v City of New York, 717 F2d 700, 710 [2d Cir 1983].)
While courts have held that an inference may be drawn from one’s refusal to testify in a civil matter, they also have held that “[s]ilence may only be one of a number of factors which the finder of fact considers in making its determination.” (Matter of DeBonis v Corbisiero, 155 AD2d at 301.)
In the DeBonis matter, petitioner invoked his Fifth Amendment right and refused to testify in front of the New York State Racing and Wagering Board at a hearing after it found that petitioner attempted to commit a fraud in connection with racing and breeding. The Board made a determination to revoke petitioner’s licenses as an owner and trainer of racing horses. The question on appeal was whether it was proper for respondents to draw a negative inference from petitioner’s exercise of his Fifth Amendment right not to testify at the administrative hearing.
The First Department held that although an adverse inference may be drawn when one refuses to testify pursuant to the Fifth Amendment in a civil proceeding, in that case, “petitioner’s refusal to testify did not lead automatically to an adverse determination. Rather, it was one of several factors considered by the Board which determined by substantial evidence that petitioner had attempted to commit a fraud in connection with *694 breeding and racing.” (Id.) The court added that “[imposition of a civil sanction may not be based solely upon petitioner’s assertion of the Fifth Amendment.” (Id., citing Lefkowitz v Cunningham, 431 US 801, 805 [1977].)
In Baxter v Palmigiano (supra), the Supreme Court held that an adverse inference could be drawn from a prison inmate’s silence at his disciplinary proceeding. In that case, there were no criminal proceedings pending against the inmate and the state had not insisted or requested that the inmate waive his Fifth Amendment privilege against self-incrimination. The inmate had been advised that he had the right to remain silent but that his silence could be used against him and that his silence in and of itself was insufficient to support an adverse decision by the disciplinary board.
In Baxter, the Court made clear that, as per its earlier decision in Lefkowitz v Turley (414 US 70, 85 [1973]), although prison disciplinary hearings are not criminal proceedings, “if inmates are compelled in those proceedings to furnish testimonial evidence that might incriminate them in later criminal proceedings, they must be offered ‘whatever immunity is required to supplant the privilege’ and may not be required to ‘waive such immunity.’ ” (Baxter v Palmigiano at 316.)
The Court in Baxter distinguished the circumstances surrounding a series of earlier cases in which it invalidated various state statutes requiring individuals who were subject to interrogation about their job performance or contractual relations with the state to waive their Fifth Amendment privilege not to respond or object to later use of incriminating statements in criminal prosecutions, and upon refusal to waive, were automatically terminated or deemed ineligible to contract with the state. (See Lefkowitz v Turley, supra; Garrity v New Jersey, 385 US 493 [1967]; Gardner v Broderick, 392 US 273 [1968]; Uniformed Sanitation Men Assn., Inc. v Commissioner of Sanitation of City of New York, 392 US 280 [1968].)
The court pointed out that the Rhode Island prison rules applicable in the Baxter case did not require inmates to waive their Fifth Amendment privilege, but advised them that if they invoked the privilege it could be used against them. However, a Rhode Island inmate electing to invoke the privilege could not then be automatically found guilty of the infraction with which he was charged; rather the statute required that disciplinary decisions “must be based on substantial evidence manifested in the record of the disciplinary proceeding.” (425 US at 317, quoting Morris v Travisono, 310 F Supp 857, 873 [RI 1970].)
*695 The court ruled that
“[i]t is thus undisputed that an inmate’s silence in and of itself is insufficient to support an adverse decision by the Disciplinary Board. In this respect, this case is very different from the circumstances before the Court in the Garrity-Lefkowitz decisions, where refusal to submit to interrogation and to waive a Fifth Amendment privilege, standing alone and without regard to the other evidence, resulted in loss of employment or opportunity to contract with the State. There, failure to respond to interrogation was treated as a final admission of guilt. Here, Palmigiano remained silent at the hearing in the face of evidence that incriminated him; and, as far as this record reveals, his silence was given no more evidentiary value than was warranted by the facts surrounding his case. This does not smack of an invalid attempt by the State to compel testimony without granting immunity or to penalize the exercise of the privilege.” (Id. at 317-318.)
Petitioner cites a number of cases in support of its argument that it may establish its nuisance claim based on only the documentary evidence of respondent’s guilty plea and the negative inference it requests the court to draw. However, in none of these cases did the courts draw a negative inference solely based on an individual invoking his or her Fifth Amendment right not to testify.
In Marine Midland Bank v Russo Produce Co. (50 NY2d 31 [1980]), the Court of Appeals modified a decision by the Appellate Division which held that it was error for the trial court to charge the jury that the witness’s invocation of the privilege against self-incrimination could not be taken into account in weighing the other evidence against defendants in a civil trial, stating that “[u]nder proper instructions the jury would have been informed it could consider [defendant’s] refusal to answer [questions] in evaluating other evidence against them.” (Id. at 45 [emphasis added].)
Petitioner also points to Judge Schneider’s decision in Forty-Three E. Equities Corp. v Peter D’Agostino (Civ Ct, NY County, 2008, Schneider, J., index No. L & T 80915/06), in which she drew a negative inference from respondent’s failure to testify on his own behalf. However, in that case, the court pointed out that “[h]ere, petitioner’s proof that a very large quantity of marijuana was found in the respondent’s apartment, together *696 with a large quantity of cash and packaging material and sophisticated ‘anti-bugging’ equipment, raises the reasonable inference that respondent was engaged in an illegal business of selling marijuana.” In the instant matter, petitioner presented no such proof of drugs or other indicia of drug activity having been found in the subject premises, building, or grounds.
Additionally, petitioner cites a New York Court of Appeals case and an Appellate Division, First Department, case in support of its position that a negative inference should be drawn against respondent for failing to testify: Noce v Kaufman (2 NY2d 347 [1957]) and Jarrett v Madifari (67 AD2d 396 [1st Dept 1979]). However, neither of these cases deals with a negative inference being drawn when an individual invokes his Fifth Amendment privilege.
In Noce, involving a cause of action to foreclose a mechanic’s lien for labor and materials against the real estate owned by the respondent, a negative inference was drawn against the accountant defendant who failed to produce certain records in his possession which would have clarified some of the issues, and instead testified to generalizations which were evidence of nothing. In Jarrett, a personal injury suit against a driver whose car hit another, a negative inference was drawn when defendant failed to call any witnesses at trial who might have clarified what happened, including his wife who was a passenger in the car at the time of the accident.
Similarly, petitioner cites this court’s decision in 170 E. 77th 1, LLC v Delgrange (Civ Ct, NY County, 2007, Wendt, J., index No. L & T 104484/06, affd 19 Misc 3d 137[A], 2008 NY Slip Op 50817[U] [App Term, 1st Dept 2008]), in support of its argument that a negative inference should be drawn in the instant matter. That case is completely distinguishable. At no time in that matter, a licensee holdover proceeding, did respondents assert their Fifth Amendment privilege, and the court drew a negative inference when respondents rested without producing a single witness to dispute petitioner’s evidence, despite the fact that one respondent tenant was in the courtroom during the trial, and the other was in the hallway. Moreover, the issues in the Delgrange matter were completely different from those herein.
Even if this court were to draw a negative inference from respondent’s failure to testify, case law herein holds that this inference alone is insufficient to establish the alleged nuisance conduct. The only other evidence presented at trial by petitioner, *697 that respondent pleaded guilty to the superceding information, adds nothing to support petitioner’s nuisance claim, given that the exhibits relating to the charges, the guilty plea and the minutes from the plea itself contain no admissions of criminal conduct in the subject premises, building or grounds.
The contradictory evidence presented in the form of credible testimony by respondent’s friends and acquaintances that between them, over a period of many years, they have not seen any drugs or drug paraphernalia in the subject premises, and that they have never observed respondent using drugs in the apartment or elsewhere, is more persuasive than respondent’s guilty plea, which does not implicate the subject premises or grounds, and any negative inference this court might draw. Thus, weighing all of the evidence, petitioner has failed to sustain its burden of proof.
Petitioner claims that it presented no witnesses because the federal officials would not respond to its attorney’s subpoena. Even if this is true, petitioner presented no other proof of the alleged nuisance conduct. Certainly if respondent had been engaged in ongoing drug possession and sales over the course of three years as petitioner claims, a neighbor or building employee would have made some observation of such. Petitioner makes a point of the many playgrounds and children in the complex. If respondent was dealing drugs in the subject premises or grounds, some concerned parents undoubtedly would have complained and there would be at the very least a complaint or police report.
For all of the foregoing reasons, after a trial at which all of the testimony and exhibits were carefully considered, as well as the credibility of the witnesses, the court finds that petitioner has failed to prove by a preponderance of the credible evidence its cause of action for possession on the ground that respondent has caused a nuisance by engaging in a recurrent pattern of objectionable conduct in the form of criminal activity in the subject premises, the subject building, or on the subject grounds. Therefore, the petition in this matter is dismissed.